**STATE of Missouri, Respondent,**

v.

**Thomas Wayne SUSCHANK, Appellant.**

**No. 39811.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 26, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 15, 1980.

Application to Transfer Denied
April 8, 1980.

William J. Shaw, Public Defender, Joseph W. Downey, Asst. Public Defender, Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Michael P. Donegan, Asst. Attys. Gen., Jefferson City, George R. Westfall, Pros. Atty., Clayton, for respondent.

REINHARD, Judge.

Defendant appeals from a judgment of conviction following a jury verdict of guilty of the offense of murder second degree. The court sentenced him to serve a term of life imprisonment in the Department of Corrections.

Defendant contends the state presented insufficient evidence to sustain a verdict of guilty. Victim and defendant lived in adjoining apartments. On the morning of November 1, 1976, a neighbor saw the victim's young son standing in the parking lot. She told the son to go home but when he failed to obey, she went to the victim's apartment, opened the door, and saw victim's body. Shortly thereafter, defendant came out of his apartment and upon being informed by the neighbor that the victim was dead, he looked into the victim's apartment. The neighbor was then joined by her husband. Defendant and the husband went into victim's apartment. Thereafter, defendant went to his apartment and returned with a blanket which he placed over the victim's body.

When the police arrived, they found the victim on the floor with her clothes disheveled. The victim appeared to have received three blows to the head and had lost a lot of blood. On the floor near the victim lay a candle. Imbedded in the candle was a hair which was microscopically similar to the hair of the victim. Also nearby lay a broken plaster bust of W. C. Fields; the particles of plaster were scattered throughout the room.

The police interviewed defendant. He had two scratches on his face and a cut on the outside portion of his little finger. Defendant said he received the scratches while attempting to start his vehicle the night before. He was not sure whether he had touched anything while in the apartment and said he had only been in the apartment one time before.

A search of defendant's apartment turned up a plastic trash bag which contained a brown pullover sweatshirt. On the shirt the police found a bloodstain and what appeared to be white particles of plaster. At the end of the walk-in closet in defendant's apartment a piece of plaster wall had been cut which permitted entry into the victim's apartment.

Richard Nelson, defendant's cousin, had been living with defendant for about three weeks. Nelson testified that around midnight, he, defendant, and defendant's girlfriend, Carol, tried to take Carol home in defendant's car but the car would not start. Defendant looked under the hood. He made no complaint to Nelson about scratching himself on the car. Nelson and the defendant borrowed another car, took Carol home, then went to Illinois to buy beer, returned to the apartment, and shared a marijuana joint. At 3:00 a. m., Nelson went to bed on the couch in the living room. At that time, defendant was wearing the sweatshirt which was later found in the trash bag. Nelson testified that defendant previously told him that it was possible to get through to the next apartment from the living room closet and that defendant had

gone into the apartment once to steal some money. While drinking beer, Richard did not notice any cuts on defendant's face.

Carol, defendant's girlfriend, testified that when she kissed defendant good-night after he had taken her home, she did not see any scratches on his face; but that she was not wearing her glasses at the time and without them her vision was impaired.

Nelson and defendant had the same blood type and the victim had a different type. The victim's blood type was present on the shirt found in the plastic bag. Microscopic examination of the small white particles found on the shirt showed them to be similar to the white plaster pieces of the W. C. Fields bust and plaster board found in the closet. A police officer specializing in identifying fingerprints testified that the fingerprints lifted off the candle seized from the victim's apartment were definitely those of the defendant's left palm.

■■■ All the elements of a homicide case may be proved circumstantially. *State v. Ross*, 371 S.W.2d 224, 225 (Mo.1963). However, when a case is based on circumstantial evidence, the circumstances and the facts must be consistent with each other and with the hypothesis of guilt, be inconsistent with the hypothesis of innocence, and point so clearly to guilt as to exclude every reasonable hypothesis of innocence. This rule has been refined to mean that where a case rests on circumstantial evidence, circumstances need not be absolutely conclusive of guilt and need not demonstrate the impossibility of innocence. *State v. Montgomery*, 571 S.W.2d 784, 786 (Mo. App.1978). Further, when a state's case is entirely circumstantial, as here, all evidence on the whole record tending to support the guilty verdict must be taken as true, contrary evidence disregarded, and every reasonable inference tending to support the verdict indulged. *State v. Burnley*, 480 S.W.2d 881, 882 (Mo.1972). We have examined the facts and evidence in this case and based upon the above enumerated principles find that the state made a submissible case against the defendant.

Defendant next contends that the court erred in failing to declare a mistrial when it discovered that the jury obtained a dictionary during its deliberations.

During the jury's deliberations it was learned that the jury had asked the bailiff to obtain for them a dictionary. Without the knowledge of the court or counsel, the bailiff found a dictionary and delivered it to the jury. Defendant made a motion for a mistrial which was overruled by the court. After the jury returned a verdict, the court proceeded to voir dire the jury to determine what had occurred. All the jurors stated that the dictionary was used to define a single word. The recollection of Juror No. 1 was that the word was "coolly." Juror No. 6 stated that the jurors thought about looking up the word "coolly" but did not because they concluded such action would be of no value. Juror No. 10 could not remember what word was in question, explaining that it was just a plain simple word that she was not interested in. With the exception of Jurors No. 1 and No. 10 each of the jurors recalled that they used the dictionary for the word "reasonable." The court asked each juror, except Juror No. 1, whether the use of the dictionary had any effect on his verdict or vote in the case and each one answered "no." The state requested that Juror No. 1 be recalled to answer the same question, but defendant objected stating No. 1 had been allowed to join the rest of the group. The court sustained the objection and noted that Juror No. 1 had mentioned the word "coolly."

Defendant's counsel renewed his motion for mistrial; but the court denied the motion stating that after having heard the evidence, including the testimony of the jurors, it did not feel that the use of the dictionary entered into the jurors' conclusion and it was clear that the verdict would have been the same with or without a dictionary.

Courts differ as to the effect of the use of a dictionary by a juror. *See generally*, Anno., 54 A.L.R.2d 738 (1957). All courts view the use as highly improper; the jury should have relied solely upon the evidence

for the facts and the court's instruction for the law. However, it is apparent from a reading of the case law that only a few jurisdictions apply a per se prejudicial rule. Most courts have found no resulting prejudice, either because the trial court, by curative action, eliminated any harmful effect of the dictionary or because there was an affirmative showing that the use of the dictionary did not influence the jury.

No Missouri case has been directly confronted with the use of a dictionary during jury deliberations. In *State v. Taylor*, 581 S.W.2d 127 (Mo.App.1979), the Western District recognized that the use of a dictionary by the jury would "have been patently improper." *Id.* at 129. There, however, the court was not confronted with the use of the dictionary and its effect on the verdict. We agree that it was improper for the jury to have access to a dictionary, however, not every case of misconduct by a jury requires a reversal.

■ The receipt by a juror or jury of possibly prejudicial information during the trial of a felony case requires that the verdict be set aside unless the harmlessness of the information be shown. On appeal, we must decide whether the incident resulted in prejudice to the defendant such that as a matter of law, the court abused its discretion in refusing to grant a mistrial. *State v. Raspberry*, 452 S.W.2d 169, 173 (Mo. 1970); *State v. Akers*, 328 S.W.2d 31, 35 (Mo.1959).

■ Ordinarily, a verdict cannot be impeached by testimony of jurors. Here, the defendant did not object to the questioning of the jury after the verdict and therefore, we are not confronted with the prohibition against the impeachment of a verdict. The trial court could properly consider the testimony of the jurors in determining the prejudicial effect of the use of the dictionary. *Bailey v. Hilleman*, 566 S.W.2d 504, 506 (Mo.App.1978). All of the jurors except Juror No. 1 stated that the use of the dictionary had no effect on their verdict. Juror No. 1 thought the word in question was "coolly." The trial court did not abuse its discretion in failing to grant

either a mistrial or a new trial. *See State v. Holt*, 79 S.D. 50, 107 N.W.2d 732 (1961).

■ In reaching our determination we are aware that the word troubling some of the jurors was "reasonable." Apparently, the jury was confronted with the age old problem of defining "reasonable doubt." MAI–CR 2.20 tells the jury that the state has the burden of proving defendant's guilt beyond a reasonable doubt. There is a well-settled rule in Missouri that: "a judge may not comment upon the phrase 'reasonable doubt' and the notes on the use of MAI–CR 2.20 forbid a trial judge from giving any other instruction that elaborates on, or attempts to define, 'reasonable doubt.'" *State v. Lasley*, 583 S.W.2d 511, 514 (Mo. banc 1979). The Supreme Court recently reaffirmed this position in *State v. Lumsden*, 589 S.W.2d 226 (Mo.1979). In *Lumsden*, the court held that a defendant may not question a juror on voir dire concerning the juror's definition of "reasonable doubt" for any purpose. The court bases its holding on the policy expressed in Missouri's instructions, rules, and case law "that reasonable doubt is not to be further defined by the court, let alone by a juror." *Id.* at 229. In dissent, Judge Welliver analyzes the underlying reasons for the proscription against defining "reasonable doubt." He reveals that the proscription exists because it is assumed "that jurors, as speakers of the language, know the ordinary usage of the terms, and could not be aided by a court's reformulation of the standard in other terms. No formulation in more basic terms is possible." *Id.* at 233.

■ It is apparent from the judge's questioning of the jury that the jurors found no definition of "reasonable" in the dictionary which differed from their knowledge of the ordinary usage of the term and therefore the court's determination that the defendant was not prejudiced by the use of the dictionary was not an abuse of discretion.

Judgment affirmed.

DOWD, P. J., and CRIST, J., concur.