**STATE of Missouri, Respondent,**

v.

**Brian Andrew ABBOTT, Appellant.**

**No. 12772.**

Missouri Court of Appeals,
Southern District,
Division Three.

June 9, 1983.

As Modified July 1, 1983.

Motion for Rehearing or Transfer
Denied July 1, 1983.

Application to Transfer Denied
Aug. 16, 1983.

262

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Nancy Hentig Narrow, Asst. Public Defender, Jackson, for appellant.

CROW, Presiding Judge.

A jury found appellant ("Abbott") guilty of murder in the second degree, § 565.004, RSMo 1978, as charged in Count I of the information, and guilty of stealing a motor vehicle, § 570.030, RSMo 1978, as charged in Count II, and assessed prison sentences of 30 years and 7 years, respectively. The trial court sentenced Abbott to those terms, to run consecutively.

■ Abbott briefs 10 points, one of which (number 4) is that the trial court erred in denying Abbott's motion for judgment of acquittal as to Count I at the close of the State's case, and in denying a similar motion at the close of all the evidence. Abbott makes the same assertion as to Count II (point number 9). He argues there was insufficient evidence to submit either Count to the jury.[1] Other allegations of error will be considered after reviewing the evidence.

In determining whether the evidence is sufficient to sustain the verdicts, we accept the State's evidence as true and give the State the benefit of all reasonable inferences deducible therefrom, disregarding all evidence and inferences to the contrary. *State v. Jones,* 594 S.W.2d 932, 935[2] (Mo.1980).

The murder victim was Margaret H. Smith, a 73-year-old, unmarried, retired geography professor at Southeast Missouri State University. The motor vehicle that was stolen belonged to her.

On Thursday, July 10, 1980, Dr. Smith was residing alone in her home at 1526 Bertling Street in Cape Girardeau. She was between five feet two inches and five feet three inches tall, and weighed about 140 pounds. That afternoon the pastor of her church visited her between three and four o'clock and found her in good health. About dusk, Louis O. McAtee, her next door neighbor for over 15 years, saw her tending flowers in her yard. Her automobile, a "white over red" 1978 Oldsmobile Cutlass,

was in her carport. McAtee never saw Dr. Smith again.

That same day, Abbott (date of birth, November 14, 1963) was residing with his parents at 1216 Bertling, "three or four houses" east of the intersection of West End Boulevard and Bertling, and about two to three blocks east of Dr. Smith's home. Abbott was employed at the municipal swimming pool at Capaha Park in Cape Girardeau.

Abbott got off work when the pool closed at nine o'clock that evening. He phoned his father, explaining that he was going to a friend's house and would be home "around 10 or 10:30." Abbott then walked with four other teenagers, including Mark Ikerman and Tammy Houck, from the pool to the Houck home, the journey requiring 15 or 20 minutes. Abbott remained at the Houck home until about 11:15 or 11:30, then departed on foot with Ikerman, whose home was near Abbott's.

Abbott's mother testified that her husband became upset when Abbott was not home by 10:30. She quoted her husband as saying he was going to make Abbott believe he was going to obey his "curfew." Mrs. Abbott's husband packed Abbott's clothes in a box and put the box on the back porch at 11:00 p.m., then went to bed. Mrs. Abbott remained in the living room, trying to "listen" for Abbott. She fell asleep, however, and did not awaken until morning.

About 11:40 p.m., July 10, Mark Ikerman's mother left the Ikerman home in her automobile, looking for Mark. She saw him on West End, a few blocks from home, walking with Abbott. She picked them up, taking Abbott to the corner of West End and Bertling. Abbott got out there about 11:45, and Mrs. Ikerman continued home with Mark.

A little over 30 minutes later, Michael Frisbee got off work at a restaurant in Cape Girardeau and began driving around,

[1]. Abbott also alleges in points 4 and 9 that the trial court erred in denying Abbott's motion for new trial because there was insufficient evidence to submit either Count to the jury. We note, however, that if the evidence was insufficient to support a guilty verdict, the remedy is to enter judgment of acquittal, not award a new trial. *State v. Wood,* 596 S.W.2d 394, 398[1] (Mo. banc 1980).

and after a few minutes saw a friend, Randy Todd. Frisbee picked Todd up and continued driving until about 12:50 a.m., July 11, 1980. At that time, Frisbee dropped Todd off in a parking lot of a closed fast-food restaurant. Todd got in a red Cutlass with a white top. At trial, Frisbee was shown photographs of Dr. Smith's Cutlass, and identified that vehicle as the one Todd entered. Frisbee also identified Abbott at trial, and testified Abbott was in the Cutlass when Todd entered it.

About 6:30 or 7:00 a.m., July 11, 1980, Dr. Smith's neighbor, McAtee, noticed Dr. Smith's Cutlass was not in the carport where it had been the evening before. McAtee never saw the Cutlass again.

Tammy Houck saw Abbott about 1:00 p.m., July 11, 1980, at her home. Abbott was driving a white over red Oldsmobile. At trial, Tammy was shown photographs of Dr. Smith's Cutlass, and identified that vehicle as the one Abbott was driving. Tammy had never seen Abbott in that vehicle before. She quoted Abbott as saying he got the car from his uncle, but didn't want anyone to know he had it. Abbott explained his parents had "kicked him out" of the house the night before, so he slept in the car. Some of Abbott's clothes were in the back seat.

On Sunday, July 13, 1980, about 7:30 a.m., Officer Lisa McElreath of the Cape Girardeau police department, saw a two-door Oldsmobile with a white vinyl top parked on the roadside in Shawnee Park in Cape Girardeau. Officer McElreath attempted to check the license plate registration by radio, but the computer was out of service. Officer McElreath discovered Abbott asleep in the front seat and Randy Todd asleep in the back seat. She instructed them to leave the area. At trial, Officer McElreath was shown photographs of Dr. Smith's Cutlass, and identified that vehicle as the one occupied by Abbott and Todd.

On Wednesday morning, July 16, 1980, McAtee, who had become increasingly concerned about Dr. Smith's absence, entered her home with a key she had given him many years earlier, and which he had used in the past to "look after things" and feed her cat when she was gone. McAtee explained that Dr. Smith always kept the door between her kitchen and front room closed, confining the cat to the kitchen. When he entered, McAtee discovered the cat in a part of the house where it was not ordinarily allowed. McAtee saw "the clothes and everything was scattered all over the floor back in the bedroom and I knew then it was time to do something." He contacted the police.

Lt. Dennis Dolan of the Cape Girardeau police department sent two evidence technicians to Dr. Smith's home, and went there himself a short time later. Dolan saw a tear in the screen door on the rear entrance. The tear measured "2 inches horizontally and 2½ inches vertically." He found no other sign of possible forced entry.

There was a blood spot on the kitchen floor "that looked like one had stepped in or had on their shoes and tracked." In the living room, a few feet from the kitchen, there were two bloodstains on the carpet in front of a desk. A calendar on the desk had a "small smear stain." A "fingertip" bloodstain was found on the inside of the front door.

In a hallway connecting the living room to Dr. Smith's bedroom, a bloodstain "about the size of a quarter" was found on the carpet about three feet from the bedroom door frame. There was a small amount of blood on the door frame, and a small blood spot by the light switch on the bedroom wall. The bed was "pretty disarrayed," and the technicians found no top sheet or bedspread on the bed. Two drawers were pulled out, their contents spilled on the floor. The technicians found two white "socks," one on the floor and the other on the bed beneath a pillow.

In the bathroom, a small bloodstain was found on the side of the tub near the floor, and another bloodstain was found on the bathroom carpet just below the stain on the tub. A footprint was discovered on the side of the tub, similar in size to several shoes in the bedroom closet.

There were "markings" indicating something had been "drug" against the grain of the bathroom and hall carpets, into the living room.

The technicians collected samples of the bloodstains, and took possession of the calendar and the two socks. They also took a diary lying on a stand in the living room.

In addition to processing Dr. Smith's home for evidence, the police issued an "all points bulletin" for her Cutlass.

Abbott was taken into custody "under juvenile jurisdiction," that same day, July 16, 1980, and the Cutlass was found by police in Capaha Park about a mile from Dr. Smith's home.

The Cutlass was impounded, and searched by a police evidence technician the evening of July 16. The technician removed a piece of newspaper and a paper towel from the trunk, along with a pair of tennis shoes and a knife sheath.

The calendar, socks and bloodstain samples from Dr. Smith's home were submitted to the Southeast Missouri Regional Crime Laboratory at Cape Girardeau for examination. The Laboratory director, an experienced chemist with a bachelor's and doctor's degree in that field, performed tests on the samples from the bedroom wall, door frame, hall carpet, bathroom carpet, bathtub, living room carpet, kitchen floor and calendar. All of those stains were type A human blood. The director also tested the newspaper, paper towel and tennis shoes removed from the trunk of Dr. Smith's Cutlass. He found type A human blood on the newspaper and the left tennis shoe. In his opinion, the blood on the shoe had been there no more than a month.

Dr. Smith had type A blood.

The director performed further tests on the stains on the bathroom carpet and the newspaper from the Cutlass' trunk, and identified "five additional genetic factors." From calculations based on the average frequency of occurrence of those factors in the population, the director concluded that less than one person in a hundred would have the combination of factors found in the stains on those two items.[2] It was the director's opinion that the blood in those two stains came from the same individual.

The director found a green nylon carpet fiber on the newspaper from the Cutlass' trunk. That fiber was consistent with a fiber from the bathroom carpet.

The director tested the socks, and concluded "seminal material" was present on both.

On February 23, 1981, more than seven months after Dr. Smith disappeared, her skeletal remains were found down an embankment on the east side of route 177 about three miles north of Cape Girardeau. They were 27 feet from the shoulder, not visible from the roadway because of the 50 degree slope and underbrush.

A purse was found 30 feet from the remains. The purse contained a "pocketbook" with credit cards issued to Dr. Smith, a nightgown, a matching robe and a towel. There were no tears or cuts in the nightgown or robe. No trace of clothing was found with the remains.

A forensic anthropologist, whose qualifications were stipulated, examined the remains at the site. He found no evidence of bullet wounds, cutting, or broken bones. There was some dry tissue holding most of the remains together, but the flesh had almost completely decayed. Insect larvae beneath the upper part of the remains indicated it was "quite possible" that the body had been there since the preceding July.

On February 26, 1981, the nightgown, robe and towel were taken to the Crime Laboratory, and the director found stains of type A human blood on the nightgown and bloodstains on the towel.

Sometime before trial, at the request of Abbott's attorneys, the director did some additional tests on the socks, and again concluded that seminal material was present on both. At trial, the director explained that about 80 per cent of the people secrete their blood type in body fluids such

2. The percentage was .85 per cent.

as seminal material, urine and saliva. Analysis of the seminal stains on the socks revealed they were from a person with type B blood. That type occurs in about 15 per cent of the population. Recognizing that only half the people with type B blood are males (7.5 per cent of the population), and that only 80 per cent of those would be secretors, the director concluded that the seminal material on the socks could have come only from about six to seven per cent of the population.

The director tested specimens of Abbott's blood and saliva. Abbott has type B blood, and secretes his blood type in his saliva. Randy Todd had type O blood.[3]

At trial, Professor Constance Rowe, a colleague of Dr. Smith for over 10 years, was shown the diary taken from Dr. Smith's home by the evidence technicians. Professor Rowe identified the handwriting in the diary as Dr. Smith's. There were no entries after July 10, 1980, except reminders about future events. Professor Rowe never knew Dr. Smith to lend her automobile to anyone. Professor Rowe was shown the knife sheath removed from the trunk of Dr. Smith's Cutlass July 16, 1980, and testified she had never seen the sheath in Dr. Smith's possession.

Elizabeth Ann Ramey, a swimming instructor at the pool in Capaha Park in the summer of 1980, saw Abbott around noon on Monday, July 14, 1980, in the pool parking lot. Abbott was driving a white over red General Motors car, accompanied by two other young males. Elizabeth asked Abbott where he had gotten the car, and Abbott replied he had gotten it from a friend. At trial, Elizabeth was shown photographs of Dr. Smith's Cutlass, and she identified that vehicle as the one Abbott was driving. Elizabeth was shown the tennis shoes removed from the Cutlass' trunk July 16, 1980, and testified they resembled shoes Abbott was wearing the day she saw him in that vehicle. Elizabeth was also shown the knife sheath found in the Cut-

lass' trunk. She recalled having seen a sheath knife on Abbott's belt on two occasions in June, 1980, and testified the sheath from the trunk was the same type Abbott had worn.

James G. Bridgens, a licensed physician specializing in pathology, whose expertise in forensic pathology was stipulated, testified that in his opinion Dr. Smith "met her death by multiple stab wounds." He explained that penetrating wounds frequently result in very little external bleeding, and that often blood comes from such wounds only when the body is moved. Dr. Bridgens ruled out all other causes of death except strangulation, and as to that possibility he pointed out that the bloodstains in Dr. Smith's home were inconsistent with strangulation because "patients don't bleed when they're strangled and we've got to have some type of injury that's going to cause some hemorrhage. Hemorrhage into the body cavities, so that when this body is moved from one position to another blood is going to come out of the wound."

Abbott testified that after Mrs. Ikerman let him out of her automobile at the corner of West End and Bertling about 11:45 p.m., July 10, 1980, he walked home and found his clothes outside the back door. Abbott "knew what that meant because me and my father had been having problems and he said if I didn't obey him coming in at the time I was supposed to that he was going to kick me out and that I'd have to live on my own."

Abbott testified he decided to go to a friend's house near Capaha Park. According to Abbott, he walked there carrying his clothes, but saw no car and no lights. Assuming no one was home, Abbott walked to another friend's house but got no answer when he knocked on the door. Abbott explained he then walked into a parking lot and saw some cars, and decided to take one and go to the home of an aunt or a sister. He found a red and white Oldsmobile with unlocked doors, and got in to see "if I could

3. In a pretrial hearing it was disclosed that Todd died in the fall of 1980, his body being found in a ditch. At least one person admitted running over him, but he may have been dead when that occurred. The jury heard testimony that Todd was deceased, but no details.

hot wire it." Abbott testified he found the keys on the floor, put his clothes in the trunk and "took off" in the car. After driving around he parked in the lot of a fast-food restaurant, and while there Randy Todd arrived with "Frisbee." Todd entered the Oldsmobile and asked for a ride to a friend's house, explaining that he (Todd) had also "got kicked out of the house." Abbott testified he took Todd to some apartments, then drove to the home of a "girl friend" near Scott City. On arrival, Abbott found "there wasn't nobody up," so he parked the car and fell asleep, remaining there until morning. Abbott testified he knew the vehicle was not his, and that it belonged to somebody else. He continued using it until his arrest July 16, 1980. He denied killing Dr. Smith, but admitted stealing the Cutlass from the parking lot.

A year or more after Abbott was arrested, a detective had Abbott try on one of the tennis shoes found in the Cutlass' trunk. Abbott got it on, but it was "too tight to wear."

Abbott asserts the evidence was insufficient to support a finding that he was responsible for the killing of Dr. Smith. He argues that because the State's case was based entirely on circumstantial evidence, motive is a very important factor, and there was no evidence that he had a motive to kill Dr. Smith.

■ Motive is not an essential element of the crime of murder. *State v. King,* 433 S.W.2d 825, 827[1] (Mo.1968). The presence or absence of motive is an evidentiary circumstance to be given such weight by the jury as they consider it entitled to under all the circumstances. *Id.* at 827[2]. All elements of a homicide case may be proved circumstantially. *State v. Ross,* 371 S.W.2d 224, 225[1] (Mo.1963); *State v. Suschank,* 595 S.W.2d 295, 297[1] (Mo.App.1979). When a case is based on circumstantial evidence, the circumstances and facts must be consistent with each other and with the hypothesis of guilt, be inconsistent with the hypothesis of innocence, and point so clearly to guilt as to exclude every reasonable hypothesis of innocence. *State v. Moss,* 622

S.W.2d 292, 295[1] (Mo.App.1981); *State v. Suschank,* supra, 595 S.W.2d at 297. However, the circumstances need not be absolutely conclusive of guilt and need not demonstrate the impossibility of innocence. *State v. Moss,* supra, 622 S.W.2d at 295; *State v. Suschank,* supra, 595 S.W.2d at 297[2]. Furthermore, all evidence on the whole record tending to support the guilty verdict must be taken as true, contrary evidence disregarded, and every reasonable inference tending to support the verdict indulged. *State v. Moss,* supra, 622 S.W.2d at 295, 296[2]; *State v. Suschank,* supra, 595 S.W.2d at 297[3].

■ Applying these principles, we hold the evidence sufficient to support the verdict of guilty on Count I. Abbott admitted he had lived in the same neighborhood since his birth. Dr. Smith had lived at her address over 15 years. The jury could reasonably infer that Abbott knew where Dr. Smith lived. Abbott was within three blocks of Dr. Smith's home at about 11:45 p.m., July 10, 1980, and his whereabouts for the next hour and five minutes are unaccounted for (except by his own testimony, which the jury was not required to believe, and obviously rejected). Abbott had Dr. Smith's Cutlass at 12:50 a.m., July 11, a few hours after McAtee last saw it in Dr. Smith's carport. Analysis of bloodstains on Dr. Smith's bathroom carpet and on the newspaper in the Cutlass' trunk showed not only that the blood was the same type as Dr. Smith's (type A), but also that the combination of other factors in that blood would occur in less than one per cent of the population. A fiber on the newspaper was consistent with the fiber in Dr. Smith's bathroom carpet. The fact that Dr. Smith was last seen July 10, 1980, the fact that the last entry in her diary bore that date, and the absence of evidence that her vehicle was reported stolen even though Abbott had it from 12:50 a.m., July 11, 1980, until his arrest, support an inference that Dr. Smith was not alive after July 10, 1980, even though her remains were not found for more than seven months. The type A blood on one of the tennis shoes in the

Cutlass' trunk, the testimony that the bloodstain had been on the shoe no more than a month, and witness Ramey's testimony that the shoes resembled those worn by Abbott July 14, 1980, when he was driving the Cutlass, is additional circumstantial evidence linking Abbott to the murder. Evidence that Dr. Smith died from stab wounds, witness Ramey's testimony that Abbott carried a sheath knife in June, 1980, that the sheath found in the Cutlass' trunk was the same type Abbott had worn, and the fact that only the sheath—not the knife—was found in the Cutlass July 16, 1980, is further circumstantial evidence tying Abbott to the murder. The fact that Abbott drove the Cutlass until his arrest supports an inference that he knew it would not be reported stolen because he knew its owner, Dr. Smith, was dead. The fact that Abbott has type B blood and is a secretor, coupled with the fact that the seminal material on the socks in Dr. Smith's bedroom was from a type B secretor, also connects Abbott with the murder, particularly when one considers that the seminal material could have come from only six to seven per cent of the population.

As to motive, the State argued to the jury that Dr. Smith was killed after the sexual activity that resulted in the seminal material on the socks. The jury could reasonably infer that a 73-year-old spinster would not willingly engage in such activity with an intruder, and that she was killed to prevent identification of the perpetrator, and to facilitate theft of the automobile.

The evidence was sufficient to submit Count I to the jury, and the trial court did not err in doing so. Abbott's point 4 is denied.

As to Count II, theft of the Cutlass, Abbott asserts that because he openly drove it during the time he had it, there was insufficient evidence to prove he intended to deprive Dr. Smith of it permanently. Abbott relies on *State v. Gaede*, 186 S.W. 1009 (Mo.1916), and *State v. Patterson*, 347 Mo. 802, 149 S.W.2d 332 (Mo.1941). In those cases, the items allegedly stolen (three pigs in *Gaede*, and a boat, oars and fishing nets

in *Patterson*) were openly displayed by the respective defendants. Convictions in both cases were reversed.

We find neither case applicable. The conviction in *Gaede* was reversed because of insufficient evidence that the defendant knew the pigs belonged to another. The conviction in *Patterson* was reversed because of insufficient evidence that the taking of the items was without the owner's consent.

■ Here, unlike *Gaede* and *Patterson*, Abbott admitted he knew the Cutlass belonged to someone else when he took it. During Abbott's testimony this colloquy occurred:

"Q Did you know it [the Cutlass] belonged to somebody else?

"A Yes sir.

"Q Did you steal that car?

"A Yes Sir."

Later in Abbott's testimony, this colloquy:

"A Well, I was upset and I just told myself, well, I'll just steal a car, you know, and if I get picked up for it I ain't going to worry because I was a juvenile and you know, I just figured well, they'll—

"Q —Get off, couldn't you?

"A Yeah."

Abbott's testimony alone is sufficient to support a finding that he intended to deprive Dr. Smith of the Cutlass permanently. Moreover, Abbott used the Cutlass as his own from the time he took it until he was arrested. In *State v. Armstrong*, 445 S.W.2d 367 (Mo.1969), the defendant was convicted of stealing an automobile. There, the State's evidence showed the defendant kept the vehicle and used it as his own for two weeks. This was held sufficient to submit to the jury the issue whether the defendant intended to permanently deprive the owner of the use of the vehicle, and to convert it to his own use.

Here, the jury could reasonably infer Abbott would have continued using the Cutlass had he not been arrested, particularly inasmuch as he had killed the owner (as the

jury found on Count I), and knew she could not report the taking.

We hold the evidence sufficient to support the verdict of guilty on Count II. The trial court did not err in submitting that Count to the jury. Abbott's point 9 is denied.

We now consider Abbott's other allegations of error, in the chronological order of events whence the allegations arose.

Abbott's point 5 is:

"The trial court erred in proceeding against the appellant on Count II of the information which charged him with auto theft because the appellant, who was certified as a juvenile had previously been punished for the auto theft as a juvenile and was placed in confinement at the Training School for Boys at Boonville, Missouri. Therefore, appellant's prosecution as an adult was a violation of the Fifth Amendment of the United States Constitution as applied to states through the Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the Missouri Constitution, because such prosecution constituted double jeopardy."

Abbott's brief alleges his "after-care status was revoked at a probable cause hearing held after he was taken into custody for auto theft." We assume the "auto theft" refers to the theft of Dr. Smith's Cutlass. Abbott supplied a copy of a "Notice of Probable Cause Hearing" dated August 18, 1980, addressed to him at "Training School for Boys/Reception Cottage," Boonville, Missouri. The notice alleges Abbott violated the conditions of his "placement" by "failure to adjust to community placement" and "auto theft." The notice states a "probable cause hearing" will be held August 25, 1980. The notice concludes by saying:

"FAILURE TO APPEAR FOR THIS HEARING WILL BE SUFFICIENT CAUSE FOR YOUR APPREHENSION AND DETENTION TO ASSURE A PROBABLE CAUSE HEARING. THIS WILL BE A FACT FINDING HEARING IN WHICH YOU WILL BE ASKED TO PARTICIPATE. THE INFORMATION YOU GIVE MAY BE HELD AGAINST YOU IN DETERMINING WHETHER OR NOT YOU ARE TO BE REVOKED OR TRANSFERRED. YOU WILL NOT BE FORCED TO GIVE INFORMATION IF YOU DO NOT WISH TO DO SO."

The hearing was evidently held, because the Public Defender for Judicial Circuit 32 testified about an "automobile hearing" held in the fall of 1980.[4]

Abbott's brief states that the "effect" of the hearing was that Abbott "was confined in the Boys' Training School in Boonville." This does not coincide with Abbott's testimony at trial. Abbott testified he had been in "Cape County jail" for the 21 months immediately preceding trial.[5]

When allocution was granted, Abbott's trial counsel told the court Abbott was placed under a juvenile "detainer, or whatever they want to call it," on July 16, 1980, and transferred to the Training School for Boys at Boonville "on a violation of a prior juvenile offense and he was held in confinement there under a revocation of his terms of probation from the Division of Youth Services." According to defense counsel, Abbott "stayed in that confinement until March 5th, 1981 when he was certified to stand trial as an adult." The prosecuting attorney replied that Abbott was sent to Boonville "for violations of his juvenile probation that had no relation whatsoever to the charges that were later brought against him in which he was certified to stand trial as an adult."

We assume from this record that prior to July 10, 1980, Abbott had been adjudicated

---

**4.** The Public Defender's testimony came at the preliminary hearing on Counts I and II, held May 5, 1981. Further reference is made to the Public Defender's testimony in ruling Abbott's point 2, infra.

**5.** Trial began April 13, 1982. The 21-month period immediately preceding trial would have begun July 13, 1980, three days before Abbott was taken into custody.

to be within the jurisdiction of the juvenile court[6] under § 211.031, RSMo 1978, and committed to the custody of the Division of Youth Services under § 211.181(2)(a), RSMo 1978. We further assume that at some point after his commitment—and prior to July 10, 1980—the Division of Youth Services released Abbott on aftercare supervision under § 219.026.1, RSMo 1978, under certain conditions including the requirement that Abbott make a satisfactory adjustment to placement in the community and that he not violate any State law or municipal ordinance. We also assume that after the probable cause hearing, Abbott's placement on aftercare supervision was revoked, and Abbott was in the custody of the Division of Youth Services until March 5, 1981, the date he was found by the Juvenile Court of Cape Girardeau County not to be a proper subject to be dealt with under Chapter 211, RSMo 1978.[7] § 211.071, RSMo 1978. Additionally, we assume that after March 5, 1981, Abbott was no longer in the custody of the Division of Youth Services, but was instead in jail awaiting trial as an adult.[8]

■ There is nothing before us from the probable cause hearing to show why Abbott's placement in aftercare supervision was revoked. However, even if we assume the revocation was based wholly or partially on Abbott's theft of Dr. Smith's Cutlass, the revocation would not bar Abbott's prosecution on Count II. Abbott had already been adjudicated to be within the jurisdiction of the juvenile court, and had already been committed to the custody of the Division of Youth Services pursuant to that adjudication,[9] before he stole the Cutlass. At the time he stole it, he was under after-

care supervision, subject to certain conditions of behavior. The theft of the Cutlass was therefore not the basis for Abbott's juvenile adjudication, it was simply a violation of one of the conditions of his then-existing aftercare placement.

In *Durant v. State*, 523 S.W.2d 837 (Mo. App.1975), a 14-year-old boy was adjudicated to be within the jurisdiction of the juvenile court because of shooting and wounding another. The boy was committed to the custody of the Missouri State Board of Training Schools, and placed in the training school at Boonville. A few days later the victim died, and a new petition was filed in the juvenile court. The juvenile court dismissed that petition and relinquished jurisdiction in order to allow the boy to be prosecuted for murder under the general law. § 211.071, RSMo 1959. He pleaded guilty to murder in the second degree and was sentenced to 25 years imprisonment. In a postconviction proceeding under Rule 27.26,[10] he argued that the State, by electing to proceed against him as a juvenile and committing him to the training school for the assault, placed him in jeopardy so as to preclude further action against him for the homicide which resulted from the assault. The Court of Appeals recognized there is a line of authority that adjudication and commitment in juvenile court proceedings for a specific offense bars subsequent criminal prosecution for the same offense. *Id.* at 840. The Court of Appeals held, however, that this rule did not apply in *Durant* because the elements of assault differ from those of murder, thus the offense that served as the jurisdictional fact in the juvenile adjudication was not the same offense

6. Since January 2, 1979, the term "juvenile court" has, by statute, meant the juvenile division or divisions of the circuit court of the county, or judges while hearing juvenile cases assigned to them. § 211.021(3), RSMo 1978.

7. Abbott became 17 years of age November 14, 1980, however the offenses charged in Counts I and II were committed while he was of juvenile age. The juvenile court would therefore have had jurisdiction over him regarding those offenses, absent the relinquishment. § 211.031.-1(2), RSMo 1978.

8. Our conclusion is borne out by the fact that the trial court allowed Abbott credit against his sentences for all time in confinement from and after March 5, 1981, but no credit for any earlier confinement.

9. The record before us does not show the basis for the adjudication.

10. Rule references are to Missouri Rules of Criminal Procedure.

as the one that resulted in the penitentiary sentence.

If the boy in *Durant* was subject to prosecution as an adult for the homicide that resulted from the same assault that had earlier formed the basis for his juvenile adjudication, Abbott was clearly subject to prosecution for the theft of Dr. Smith's Cutlass, as he was already under aftercare supervision by the Division of Youth Services when he stole it, and the only effect of the theft on his status was revocation of his aftercare placement.

 An adult on parole or probation, who commits a new crime, may have his parole or probation revoked, and also be punished for the new crime. *U.S. ex rel. MacLaren v. Denno,* 173 F.Supp. 237, 241[2] (S.D.N.Y.1959), *aff'd,* 272 F.2d 191 (2d Cir. 1959), *cert. den.,* 363 U.S. 814, 80 S.Ct. 1252, 4 L.Ed.2d 1155 (1960); *People v. Fugitt,* 87 Ill.App.3d 1044, 42 Ill.Dec. 922, 409 N.E.2d 537 (Ill.App.1980); *Aldridge v. State,* 273 S.E.2d 656 (Ga.App.1980); *State v. Bullock,* 589 P.2d 777 (Utah 1979); 22 C.J.S. Criminal Law § 240. *Cf. Gillis v. Swenson,* 495 S.W.2d 658, 661[3] (Mo. banc 1973). We see no reason why a different rule should apply to a juvenile whose aftercare placement is revoked by the Division of Youth Services because of unlawful conduct by the juvenile while in aftercare status. None of the cases cited by Abbott under point 5 supports his contention. The point is denied.

Abbott's point 2 alleges the trial court erred in not dismissing the "complaint" and "amended complaint" against Abbott, as the trial court acquired no jurisdiction over Abbott because the juvenile court required the Public Defender to represent Abbott at his "certification hearing" [11] even though the Public Defender informed the court of

his "conflict of interest," and as a result Abbott was denied "full and adequate representation" at the certification hearing.

In the argument portion of Abbott's brief we learn that the alleged conflict of interest was that at the time of the certification hearing, the Public Defender's office was representing a client who had told the Public Defender that Abbott had told the client that he (Abbott) killed Dr. Smith.

The legal file, Rule 30.04(a), contains a copy of a "docket sheet" showing that on April 29, 1981 (after the juvenile court relinquished jurisdiction over Abbott but before the preliminary hearing), a "Motion to Dismiss Information for Lack of Jurisdiction" was filed by Abbott's appointed counsel.[12] We note that no information was then pending against Abbott, and none could have been. § 544.250, RSMo 1978; *State ex rel. Buresh v. Adams,* 468 S.W.2d 18, 21[1] (Mo. banc 1971). No copy of the motion to dismiss appears in the legal file, a breach of Rule 30.04(a). We assume the motion raised the same issue as point 2 of Abbott's brief.

At the outset of the preliminary hearing [13] Abbott's attorneys moved orally to amend the motion to read "complaint" and "amended complaint," [14] and were granted leave to do so. They then called the Public Defender as a witness in support of the motion.

The Public Defender testified that his "office" represented Abbott at the certification hearing, and that before the certification hearing began an Assistant Public Defender informed the judge (Honorable Marybelle Mueller) that the Public Defender's office "had a conflict of interest in representing Mr. Abbott." No details were revealed to Judge Mueller. Judge Mueller

---

11. We assume Abbott means a hearing under § 211.071, RSMo 1978.

12. On March 23, 1981, two attorneys having no connection with the office of the Public Defender for Judicial Circuit 32 were appointed to represent Abbott. They represented Abbott from that date until May 17, 1982, when they were allowed to withdraw after judgment and sentencing.

13. As noted in footnote 4, supra, the preliminary hearing was held May 5, 1981.

14. The docket sheet shows a complaint was filed March 5, 1981, and an amended complaint was filed May 5, 1981.

was told only that "we should not be Mr. Abbott's attorney at that certification hearing." Judge Mueller required the Public Defender and his assistant to represent Abbott at the certification hearing.

On cross-examination, the Public Defender was asked, "Specifically can you enumerate any particular point which you feel because of your conflict denied this man a fair certification hearing?" He answered, "No." The judge conducting the preliminary hearing (Honorable A.J. Seier) pursued the point, asking, "How did your alleged conflict deny this man a fair and adequate certification hearing?" The Public Defender answered, "Judge, as I said, as to that particular issue I don't think it did."

All of this testimony by the Public Defender came at the start of the preliminary hearing. There—as at the certification hearing two months earlier—no details of the alleged conflict were disclosed.

Judge Seier found that Abbott had produced no evidence to show any conflict of interest by the Public Defender, and that any conflict, if it did exist, did not deny Abbott a fair and impartial certification hearing. Judge Seier denied the motion to dismiss, proceeded with the preliminary hearing, and, at the conclusion, ordered Abbott to answer Counts I and II in circuit court. Rule 22.07(c) and (d).

After the preliminary hearing, the record before us is bare of any indication that the issue in point 2 was raised before trial. The first time the issue is mentioned after the preliminary hearing is in Abbott's motion for new trial. In that motion, the details of the conflict are again withheld. The motion states only that there was "a potential conflict of interest and as a result the Defendant was denied full and adequate representation at the certification hearing." In the record before us, the details of the conflict appear for the first—and only—time in Abbott's brief.

In Missouri, no appeal lies from an order of a juvenile court relinquishing jurisdiction over a child so that he can be prosecuted under the general law. *In re T.J.H.,* 479 S.W.2d 433 (Mo. banc 1972). The method of reviewing such an order is by motion to dismiss the indictment in the trial court. *Id.* at 435.[15] In *Jefferson v. State,* 442 S.W.2d 6 (Mo.1969), a defendant's failure to file a motion to dismiss the information, or to remand to the juvenile court for a proper hearing, was held to constitute a waiver of any defects regarding representation by counsel during the juvenile court proceedings which resulted in relinquishment of juvenile jurisdiction. A further waiver was held to have occurred when the defendant entered a plea of guilty.

*Jefferson* was followed in *State v. LePage,* 536 S.W.2d 834 (Mo.App.1976). There, the defendant entered a plea of guilty without filing a motion to dismiss the information or to remand to the juvenile court. Thereafter, he sought to raise issues regarding the juvenile court proceedings which resulted in relinquishment of juvenile jurisdiction. The Court of Appeals held he waived any objection he had to the juvenile proceedings by failing to file such motion.

In *Ford v. State,* 534 S.W.2d 111 (Mo. App.1976), the juvenile court relinquished jurisdiction over the defendant, he was prosecuted under the general law, tried by a jury, and sentenced to life imprisonment. Before trial he filed no motion challenging the juvenile proceedings. Later, in an action under Rule 27.26, he sought to attack the juvenile proceedings. The Court of Appeals held his failure to file a motion to dismiss the information because of the alleged defects in the juvenile proceedings waived the right to raise such issues after trial.

Here, after the information was filed, there is no showing that Abbott filed a motion to dismiss it, or to remand the case to the juvenile court for a new hearing

---

**15.** *State ex rel. T.J.H. v. Bills,* 504 S.W.2d 76 (Mo. banc 1974), a later proceeding in *T.J.H.,* held prohibition to be an appropriate remedy to test the propriety of a juvenile court order relinquishing jurisdiction where the petition and presumptive proofs showed the order was void on its face as a matter of law.

under § 211.071, RSMo 1978, with different counsel. Any complaint about counsels' conflict of interest during the juvenile proceedings was thereby waived. *State v. LePage,* supra; *Ford v. State,* supra; *Jefferson v. State,* supra; *State v. Owens,* 582 S.W.2d 366, 374[2] (Mo.App.1979); *Richardson v. State,* 555 S.W.2d 83, 87[6] (Mo.App. 1977).

Even if the point were preserved, it would be unavailing. Neither Judge Mueller nor Judge Seier, the only judges who ruled on the issue, were given any clue as to the nature of the alleged conflict. A contention that counsel had a conflict of interest, without benefit of explicative facts or evidence that counsel favored one client at the expense of another, affords no basis for relief. *Ballard v. State,* 577 S.W.2d 932 (Mo.App.1979). The burden of proof to show a conflict of interest was on Abbott. Such a claim cannot be sustained on the basis of speculation, and will not be upheld absent evidence of actual conflict of interest or evidence pointing to a substantial possibility of conflict of interest. *DeConink v. State,* 557 S.W.2d 698, 699[2] (Mo.App.1977). In order to evidence a conflict of interest, something must have been done by counsel, or something must have been forgone by counsel and lost to defendant, which was detrimental to the interests of defendant and advantageous to another. *State v. Johnson,* 549 S.W.2d 348, 350[5] (Mo.App.1977).

It is evident that the person to whom Abbott allegedly made the incriminatory statement—whoever he or she was— did not testify at Abbott's trial, as there was no evidence that Abbott confessed or admitted anything to anyone. Furthermore, there is no allegation that such person testified against Abbott at the preliminary hearing, or at the certification hearing which preceded it. Indeed, there is no suggestion that the alleged incriminatory statement was ever used against Abbott in any way, nor is there any hint that the Public Defender ever had to do, or forgo, anything whatever to Abbott's disadvantage. This, coupled with the Public Defender's testimonial admission that his office's representation of the unidentified client did not deny Abbott a fair certification hearing, amply demonstrates the absence of merit in Abbott's point 2. The point is denied.

In point 1, Abbott asserts the trial court erred in sustaining the prosecuting attorney's objection to a question asked by defense counsel during voir dire examination of the prospective jurors, and in instructing them to disregard it. The question:

"The fact that the Prosecution may show that an elderly lady 73 years of age was involved in a homicide, that she was a retired college professor, that she lived alone, that she lived on the same street as Andy did, that she was a spinster, any or all of those facts, would they prohibit you from being able to look at the case impartially?"

Abbott correctly asserts that a liberal latitude is allowed in the examination of prospective jurors on their voir dire, *State v. Brown,* 547 S.W.2d 797, 799[2] (Mo. banc 1977), and that a defendant's purpose is to develop not only facts which might form the basis of a challenge for cause, but also such facts as might be useful in intelligently determining his peremptory challenges. *Id.* at 799[3]. A trial court, however, has considerable discretion in control and conduct of voir dire examination of veniremen, and an appellate court will differ or interfere with the exercise of that discretion only when the record shows a manifest abuse of discretion and a real probability of injury to the complaining party. *State v. Scott,* 515 S.W.2d 524, 527[1] (Mo.1974). Moreover, as observed in *State v. Garrett,* 627 S.W.2d 635, 642 (Mo. banc 1982), when the inquiry includes questions phrased or framed in such manner that they require the one answering to speculate on his own reaction to such an extent that he tends to feel obligated to react in that manner, prejudice can be created. The limitation is not as to the information sought but in the manner of asking. *Id.*

Here, the question was not an abstract inquiry about sympathy toward elderly persons, females, retired college professors or spinsters in general. Instead, it asked the prospective jurors to speculate on how they would react to certain specific evidence, including the fact that the victim lived on the same street as Abbott, one of the circumstances on which the State based its case.

As pointed out in *Smith v. Nickels*, 390 S.W.2d 578, 581 (Mo.App.1965), difficulty is frequently experienced in the case of questions having a dual and ambivalent character in that they may, arguably, tend to expose or to create prejudice depending on the subjective viewpoint. An established limitation prevents those questions tending to commit the prospective juror to a course of action, or asking that he speculate what his reaction might be in such manner that he might not feel free to react otherwise. *Id.* The question here could reasonably be understood to exceed that limitation. Given the broad discretion accorded the trial court, which extends to the control of specific questions, *State v. Scott,* supra, 515 S.W.2d at 527, and recognizing the possible import of the question, phrased as it was, we cannot say discretion was abused. Point 1 is denied.

In point 8, Abbott asserts the trial court erred in allowing one of the evidence technicians to testify concerning the position a person would have to be in to make the footprint on the side of the bathtub in Dr. Smith's home, because the technician's opinion was "pure speculation and conjecture," and the technician was not shown to be "an expert in this area."

Pertinent to this point, the transcript shows:

"Q All right, now in what position would someone have to be in order to leave that particular print on the side of the bathtub.

"MR. McMANAMAN [defense counsel]: I object to that, your Honor. I think that's beyond the scope of this witness' ability to testify. He's not competent to testify to that.

"MR. LIMBAUGH [prosecuting attorney]: Your Honor, if I may, he is the only one who was there that saw these items. No photograph, no video tape or other piece of evidence can accurately portray how this was positioned in relation to everything else in the bathroom.

"THE COURT: If the witness knows, he may testify. Your objection is overruled at this point.

"Q Now sir, my question is what position would someone have to be in that bathroom to leave that print on the side of the bathtub?

"A This latent footprint is on the vertical surface of the bathtub and the only position or angle that one would have to be in would be laying on the floor with the feet against the vertical side of the tub.

"Q And where would one's back be as they were laying on the floor?

"A The distance between the tub and the door, they would probably be against the doorway if the door—or excuse me, would be against the door if the door was closed and if the door was open they would probably be laying flat on their back out into the hallway."

A photograph of the bathtub, showing the footprint, was admitted in evidence.[16] The print is on the outside wall of the tub near the end farthest from the faucets. The long axis of the print runs vertically, the heel being nearer the floor. The print ends at the top of the tub wall, it appearing that one or more toes were above the rim, rather than against the tub wall, when the print was made. The photograph was taken facing the side of the tub, looking through the bathroom doorway. The door is hinged to the doorframe at the viewer's right, and opens inward toward the tub.

Although Abbott refers to the technician's testimony as "opinion testimony," we do not believe it was. In *State v. Drake*,

16. State's Exhibit 28.

298 S.W.2d 374 (Mo.1957), a deputy sheriff testified that a particular crowbar was used to force a window open, making a demonstration with the window sash before the jury. The witness also testified that heel and shoe marks on the premises were made by the defendant's shoes. The Supreme Court held this testimony was not a statement of opinions or conclusions, but testimony as to facts personally observed by the witness. In *State v. Eaton*, 504 S.W.2d 12 (Mo.1973), a police officer testified he observed a comparison of the end of a pair of pliers found in the defendant's automobile with an indentation in a door facing, and that it fit perfectly. The Supreme Court held this testimony was not a matter requiring special skill, knowledge or expertise not within the understanding of mankind generally. The officer testified to a fact issue open to the sense of sight, and did not purport to do so in the role of an expert witness.

▮ The same rationale applies here. A footprint on a vertical surface near a floor, with the long axis of the foot running vertically and the heel nearer the floor, can only be made by a foot pointing upward. The technician personally observed the position of the print on the tub, the location of the tub relative to the doorway, and the distance between them. Determining the place where a person would have to be, and his position, in order to leave the print did not require special training or expertise. Anyone of normal intelligence who saw what the technician did could testify as he did. Admission of the testimony was not error.

In his brief, Abbott makes another argument against admissibility, asserting that "expert testimony" regarding the position of the print was not needed, as the jurors were just as capable of drawing their own conclusions as the technician. This contention was not made to the judge when the issue arose at trial, nor was it included in

Abbott's motion for new trial. Accordingly, it is not before us for consideration. *State v. Peterson*, 545 S.W.2d 717, 719[5] (Mo.App.1977). Even if it were, we have concluded that the technician's testimony was not "expert testimony," thus the argument is inapposite.

▮ Furthermore, even if admission of the technician's testimony had been error, Abbott would be entitled to no relief. Error in admission of evidence in a criminal prosecution does not necessarily call for reversal of a conviction; only prejudicial error is reversible error. *State v. Williams*, 606 S.W.2d 254, 257[3] (Mo.App.1980). A defendant in a criminal prosecution claiming error in the reception of evidence has the burden of showing both error and prejudice. *Id.* at 257[4]. Nothing about the footprint connected Abbott with the murder of Dr. Smith. At most, the print merely indicated where Dr. Smith was at some point during the fatal encounter.[17] Abbott has demonstrated no prejudice, and we detect none. Point 8 is denied.

In point 10, Abbott assigns error in the trial court's refusal to allow him to testify about "certain statements he and the deceased, Randy Todd, had concerning the fact that he and Todd had been kicked out of their respective homes and were going to St. Louis to live."

During Abbott's direct examination he testified about finding his clothes outside the back door of his parents' home near midnight July 10, 1980, and looking for somewhere to spend the night. Abbott testified that when Todd joined him at the fast-food restaurant in the early morning of July 11, 1980, "[W]e talked and he asked me—or he told me that he got kicked out of the house and I told him I got kicked out of the house and he told me where he was going to go—". At that point an objection by the prosecuting attorney on the ground of hearsay was sustained. Defense counsel made an offer of proof, proposing to show

---

**17.** Recalling the evidence that the print was similar in size to several shoes in the bedroom closet, the jury could reasonably find that the print was made by Dr. Smith as she sat on the bathroom floor with her foot against the tub and her back against the door, attempting to hold it shut.

"the conversation between the defendant and his passenger, Randy, as to what they were going to do now that they both were kicked out of their house and they decided that basically they would stick around for awhile and then go to Texas after they could get some money, and that's our offer of proof." The offer was denied.

Thereafter, Abbott resumed his testimony, explaining that he took Todd to a friend's house. Then, this:

"Q During the course of taking him over there did you in fact speak with him?

"A Yes sir.

"Q And as a result of your conversation with Randy what did you decide to do?

"A We was going to stay around for awhile and get some money, or save up our money and then go to St. Louis."

Later in Abbott's direct examination he related that he and Todd "decided that we was going to wait a little bit longer" because "we had another place to stay for a couple of weeks." Abbott added that they needed money and were going to save money from working and "just put it all together" and go to St. Louis. During cross-examination, Abbott testified he and Todd had no plans to go to Texas, just St. Louis.

■ We need not decide whether the trial court's ruling on the State's objection was correct, because any error in the exclusion of testimony on a particular occasion is considered harmless where testimony of similar import is subsequently introduced without objection. *State v. Foley,* 629 S.W.2d 401, 403[4] (Mo.App.1981).

■ Here, before concluding his testimony, Abbott was permitted to testify to everything in the offer of proof (including the trip to Texas, which he denied). Accordingly, no prejudice resulted from the ruling that initially prevented him from doing so. Point 10 is denied.

Abbott's point 3 is:

"The trial court erred by not allowing the appellant to testify that he had no criminal record and by not allowing appellant to argue in closing argument that defendant had no criminal record without the threat of the State going into the appellant's past juvenile history in order to impeach his credibility."

The issue arose when Abbott testified on direct examination as follows:

"Q Andy, do you have any criminal record?

"A No sir."

The prosecuting attorney objected, and at the ensuing bench conference the trial judge commented that defense counsel was "getting very close to waiving an objection to the prosecution bringing in matters with respect to his juvenile record." The prosecuting attorney then stated he would request permission to ask Abbott about being a juvenile at the time he was arrested, and that juveniles can have criminal records, "or something to that effect to imply to the jury there is a possibility that he might have had a juvenile record." The prosecuting attorney opined that defense counsel had put Abbott's character into "evidence," and added, "[W]e intend to call some character witnesses."

Defense counsel replied, "Character is not in evidence."

The trial judge then asked defense counsel, "[A]t this point would you like to withdraw that question?"

Defense counsel replied, "I personally don't want to withdraw it because I think it was right but I will because I am here with co-counsel." [18]

At the conclusion of the bench conference, defense counsel announced to the jury that the question was withdrawn.

The trial judge then told the jury, "The question is withdrawn, the last question is withdrawn and the witness' response is stricken, so is the question, and the jury is

18. As noted in footnote 12, supra, Abbott was represented at trial by two court-appointed at-torneys. Neither represents Abbott on appeal.

instructed to disregard both the question and the response."

■ The vacuity of point 3 is evident from the record. The trial judge did not prevent Abbott from testifying that he had no criminal record. Abbott's attorneys withdrew the question rather than risk unfavorable evidence in retaliation. They must have feared the State could properly adduce at least some damaging evidence, otherwise they would have stood their ground. They chose not to, a tactical decision that made it unnecessary for the trial judge to rule on the State's objection or on what evidence, if any, the State could present regarding Abbott's "juvenile record" or his character.

■ Where an offer of evidence is withdrawn following objection thereto and prior to a ruling on admissibility, the party withdrawing the evidence cannot predicate error on the failure of the court to admit the evidence. *King v. Hawley,* 113 Cal.App.2d 534, 248 P.2d 491, 499[11] (Cal.App.1952); 88 C.J.S. Trial § 93. The same rule should apply where a party withdraws a question for strategic reasons, in order to avoid the danger of harmful retaliatory evidence.

■ Abbott's contention that the trial judge erred in preventing defense counsel from arguing to the jury that Abbott had no criminal record is likewise without merit. After defense counsel withdrew the question, the judge properly ordered the question and answer stricken, and instructed the jury to disregard them. An attorney should not argue matters not in evidence, *State v. Cuckovich,* 485 S.W.2d 16, 27[21] (Mo. banc 1972), and it is improper for counsel in closing argument to refer to testimony that the trial court has ruled out and instructed the jury to disregard, *State v. Ralls,* 583 S.W.2d 289, 292[8] (Mo.App. 1979). Point 3 is denied.

■ In point 7, Abbott says instruction number 8 (MAI–CR 2d 2.60, modified) was erroneous because the following language was omitted at the end:

"In your deliberations your duty is to determine whether the defendant is guilty or innocent, and, if you find him guilty, to assess and declare the punishment as directed in other instructions given to you." [19]

The instruction was required in connection with the submission of Count II, a class C felony. § 570.030.2(3)(a), RSMo 1978; MAI–CR 2d 2.60, Notes on Use 2.[20]

The omitted language is the last paragraph of MAI–CR 2d 2.60, and should have been included in the instruction. Failure to include it was error, the prejudicial effect to be judicially determined. Rule 28.02(e).

Abbott fails to explain how he was prejudiced. He says only that the jury should have been told those things contained in the omitted paragraph.

We find no prejudice. The jury—having found Abbott guilty of Count II—assessed punishment within the authorized range, exactly what the omitted paragraph instructs jurors to do. Under such circumstances, the omission was not prejudicial.

■ A conviction should be reversed only when the defendant has been prejudiced by instructional error. *State v. Kimball,* 624 S.W.2d 158, 159[3] (Mo.App.1981). No prejudice having occurred, point 7 is denied.

**19.** Instruction 8 read:
"You are further instructed that if you find the defendant guilty of stealing without consent as submitted in Instruction No. 7, the court may, under the law, sentence the defendant to either:
"1. Imprisonment for a term fixed by the court, but not to exceed the term assessed and declared by the jury in its verdict, or
"2. The payment of a fine, the amount of which would be determined by the court in accordance with applicable statutes, or
"3. Both such imprisonment and the payment of such a fine, or

"4. In addition, you may recommend that the court assess a fine in lieu of any imprisonment or in addition to any imprisonment which you may declare. The maximum fine which the court may impose is $5,000 or an amount not exceeding double the amount of defendant's gain from the commission of the crime."

**20.** MAI–CR 2d 2.60 and its Notes on Use were withdrawn effective June 1, 1983, by order of the Supreme Court of Missouri en banc; however, its use was mandatory when this cause was tried.

Point 6 charges the trial court with error in failing to give a verdict directing instruction on tampering in the second degree, § 569.090.1(2), RSMo 1978, as a lesser included offense under Count II.[21] One commits the offense of tampering in the second degree if he operates another's automobile without permission or consent. § 569.090.-1(2), RSMo 1978; MAI–CR 2d 23.22.2. Abbott tendered an instruction on that theory, and asserts it should have been given because "the evidence failed to show defendant was not going to return the vehicle." The gist of Abbott's argument is that stealing requires the intent to withhold property from the owner permanently, but tampering does not, and the jury could have found that he did not have the intent required for stealing.

The flaw in this contention is that there is no evidence to support the theory that Abbott intended to return the Cutlass. *State v. Deloch,* 628 S.W.2d 954, 956[3] (Mo. App.1982). In addition to Abbott's testimony referred to earlier on point 9, he gave the following answer when asked whether he killed Dr. Smith: "No sir, all I did was stole a car and I did not kill Miss Smith."

Later, this:

"Q Now you took that car that night didn't you?

"A Yes sir.

"Q And you knew you were stealing it didn't you?

"A Yes sir."

Still later:

"Q [W]hat were you going to do if you couldn't find a car or if Margaret Smith's car was locked?

"A I'd probably went on to another car.

"Q And the next car and the next car and the next car down the street till you find one that you could steal, right?

"A Most likely, yeah.

"Q That was your intention?

"A Yeah, to steal a car.

"Q Car thief.

"A Yeah. I admit that I stole a car.

"Q You do admit that you stole a car don't you sir?

"A Yes sir."

Nothing in Abbott's testimony, or anywhere else in the record, supports the theory that Abbott intended to return the Cutlass. He testified he was "living" in the Cutlass while he had it, and his clothes were in it when it was found by the police in Capaha Park the day he was arrested.

■■■■ The test of whether an instruction on a lesser, included offense is required is whether the evidence shows that a defendant may not be guilty of the offense charged (stealing), but may be guilty of an offense (tampering) necessarily embraced in the charge. *State v. Sturgell,* 530 S.W.2d 737, 739[4] (Mo.App.1975). Before instructions on the included or lesser offenses are compelled, however, there must be evidentiary support for such offenses. *Id.* at 739[5]; *State v. Ivery,* 534 S.W.2d 107, 111 (Mo.App.1976); *State v. Deloch, supra,* 628 S.W.2d at 956. There is none here. Point 6 is denied.

Judgment affirmed.

GREENE, C.J., and FLANIGAN, MAUS and PREWITT, JJ., concur.

## ON MOTION TO MODIFY OPINION

### PER CURIAM:

With respect to Abbott's point 6, the State says the opinion suggests or implies that tampering in the second degree by unlawfully operating or riding in another's automobile, § 569.090.1(2), RSMo 1978, is a lesser included offense of stealing a motor vehicle, § 570.030, RSMo 1978. The State asserts the Western District of this Court has held contra in *State v. St. Clair,* 643 S.W.2d 605 (Mo.App.1982), and *State v. Smith,* No. 33710 (W.D.Mo.1983) (alt. mot. for rehearing or transfer filed June 3, 1983). The State asks that our opinion be modified to reflect that tampering in the second degree is not a lesser included offense of stealing, and thus a tampering instruction could not have properly been given even if there had been some

---

**21.** Tampering in the second degree is a class A misdemeanor. § 569.090.2, RSMo 1978.

evidence that Abbott intended to return the Cutlass.

Abbott briefed point 6 on the theory that tampering in the second degree is a lesser included offense of stealing a motor vehicle, relying on *State v. Ivery,* 534 S.W.2d 107 (Mo.App.1976). The State did not challenge that proposition, but simply argued that the evidence did not support a tampering instruction because there was no evidence that Abbott intended to return the Cutlass, relying on *State v. Deloch,* 628 S.W.2d 954 (Mo.App.1982), and *State v. Sturgell,* 530 S.W.2d 737 (Mo.App.1975). We held the evidence did not support a tampering instruction, and ruled point 6 on that basis. *St. Clair* and *Smith,* the two cases relied on by the State in its motion to modify, were not cited by either party prior to submission. Indeed, *Smith* was decided only 9 days before our opinion was filed.

Because of the basis on which we ruled point 6, it was unnecessary for us to determine whether tampering in the second degree is a lesser included offense of stealing under The Criminal Code, Laws 1977, S.B. 60, effective January 1, 1979, and we did not in our opinion, nor do we now, decide that issue.