STATE of Missouri, Respondent.

v.

Paul MOSS, Appellant.

No. 43150.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 14, 1981.

Motion for Rehearing and/or Transfer
Denied Sept. 21, 1981.

Application to Transfer Denied
Nov. 10, 1981.

Wolff & Frankel, Donald L. Wolff, Clayton, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, John W. Reid, II, Madison County, Fredericktown, Mark L. Akers, Washington County, Potosi, for respondent.

REINHARD, Judge.

The defendant was convicted of murder in the second degree and sentenced by the court to a term of twenty years in accordance with the verdict of the jury. He appeals. We affirm.

Defendant contends that the state presented insufficient evidence to sustain a verdict of guilty. In the early morning of October 7, 1979, as Dennis Hull was returning by car to his home located on Reiffer Road, he saw a vehicle turn onto Reiffer Road. He followed the vehicle and recognized it as being Ronald Hampton's pickup. He could not see the driver but recognized Rosemary Hampton, Ronald Hampton's wife, sitting on the passenger side of the vehicle. The pickup turned off to the left side of Reiffer Road at the top of a hill, about three-tenth's of a mile from the intersection of Reiffer Road and Highway M, and stopped. Mr. Hull passed the pickup and went home. Mr. Hull testified that it was 12:48 a. m. when he arrived home, and that it took three to four minutes to drive from the intersection to his home.

At approximately 1:00 a. m., Rosemary Hampton came to Dennis Hull's home and told him that someone had shot her husband. Mr. Hull went to the scene of the shooting and noticed that the pickup was in the same place that it had been when he had passed it earlier. Ronald Hampton's body was lying in the pickup and gave no response when called. Mr. Hull then drove down to Highway M to meet the deputy sheriff and ambulance.

There was a full moon that night and Mr. Hull did not hear or see any other vehicles go up or down the road before Mrs. Hampton arrived. Later, when Mr. Hull arrived at Highway M to meet the deputy sheriff and ambulance, he noticed two vehicles pass on Highway M. One was driven by an elderly man and his wife, and the other was dark colored, had rectangular headlights and taillights, and was travelling between 80 and 85 miles per hour.

Larry Hahlweg, who lived near the intersection of Highway M and Reiffer Road, had spent the evening of October 6 in Flat River, Missouri. He had seen defendant in his vehicle in Flat River at 7:30 p. m. While driving home on Highway M, defendant's vehicle passed him going 65 to 70 miles per hour. Mr. Hahlweg did not see the driver of the vehicle, but he testified that there was no doubt in his mind that the vehicle belonged to defendant. It was a yellow-colored Subaru pickup with seats in the back facing the rear. It was missing a tailgate and had its license plate hanging in the window. Mr. Hahlweg had previously seen defendant driving the vehicle and knew of no other Subaru of that color and type in the area. Mr. Hahlweg followed the vehicle until he arrived home. The vehicle continued on Highway M, passing the intersection, but then turned around and returned to the Reiffer Road intersection. It then "slid" around the corner of Reiffer Road, going 35 miles per hour, and went up the road. Mr. Hahlweg testified that the vehicle turned onto Reiffer Road at approximately 12:35 a. m. and he did not see any other vehicles pass on the road thereafter.

When the deputy sheriff reached the scene of the shooting, he saw Ronald Hampton's body lying partially under the steering wheel. The driver's window of the pickup was broken out, there was glass all over the interior of the vehicle, and glass on the outside of the truck on the passenger's side. There appeared to be blood on the plastic cover of the supports of the seat on the floorboard. Rosemary Hampton did not testify at the trial, but the deputy sheriff testified that she told him that she had been in the vehicle with her husband, that there had been "one big bang," and that she did not know who shot her husband.

An autopsy report indicated that the victim had received three bullet wounds. One bullet had penetrated the chest, heart, diaphram and liver, and had caused the death of the victim. The other two bullets had penetrated the victim's left shoulder and left elbow, respectively. A fourth bullet was discovered between the victim's body and the seat of the pickup. The physician who performed the autopsy testified that two of the bullets were fired at straight angles. The murder weapon was never found.

A forensic analyst who examined the bullets testified that on the basis of certain class and individual characteristics, the bul-

lets were .38 caliber and had been fired from a .357 or .38 special caliber Smith and Wesson revolver. The bullets were lead wadcutters and each had an "x" cut into the top of it.

Don Gaston testified that in late April or early May he had sold the defendant a .38 caliber Smith and Wesson chrome-plated pistol and .38 caliber flat-nosed reload ammunition (wadcutters). Mr. Gaston had previously fired from the pistol part of a box of reload ammunition into a cedar tree located on his farm. He had acquired the ammunition from his brother-in-law in Illinois who had sold the same type ammunition to Don Gaston's brother, Norman Gaston. Mr. Gaston testified that to the best of his knowledge, Norman Gaston and David Talley, who both owned .357 magnum firearms, were the only other people to have fired a .38 or .357 caliber weapon at the tree. Mr. Gaston admitted that people came out to shoot at the tree for target practice, that all types of weapons and many rounds had been fired at the tree, and that people could have shot at the tree when he was not around.

Mr. Gaston further testified that subsequent to the sale of the pistol to defendant, defendant had asked whether wadcutters had any power or whether they were used only for target shooting. Mr. Gaston told him that they could be made more powerful by notching them.

Personnel from the sheriff's office examined the area of the tree where Don Gaston indicated may have been hit by the pistol, and looked for .38 caliber bullets. A section, six feet in height from the ground, was cut away from the tree. The county sheriff testified that every piece of bullet, which had penetrated the tree from that angle, was removed from the tree, and that the soil at the base of the tree was also examined for bullet particles. Five intact .38 caliber bullets were recovered from the tree for analysis. A deputy sheriff who assisted in the removal of the bullets testified that a number of bullets remained in the tree, that he did not know if all the bullets of .38 caliber size had been removed, and that hundreds of people in the county owned .38 caliber firearms.

Personnel from the sheriff's department test fired the .357 caliber firearms belonging to Norman Gaston and David Talley and obtained three rounds of live .38 caliber reload wadcutter ammunition from Norman Gaston, which he had acquired from Don Gaston's brother-in-law.

The forensic analyst who examined the bullets testified that the slugs recovered from the tree were fired from a .357 magnum or .38 special caliber weapon, and like the slugs recovered from the victim, were lead wadcutters. He further testified that he could positively identify two of the bullets recovered from the tree as having been fired from the same revolver which fired the bullets recovered from the victim. On the other hand, he testified that the bullets test fired from David Talley's and Norman Gaston's guns and the bullets recovered from the victim were not fired from the same gun.

A forensic chemist compared the bullets recovered from the victim with the bullets acquired from Norman Gaston, and testified that they had similar elemental ratios, were similar in elemental composition, and could have had the same origin. However, when he examined the elemental ratios of sixteen other types of ammunition from his laboratory, he found a wide variance in ratios.

David Talley testified that he had seen defendant with a small .38 caliber revolver with a stainless steel or chrome finish in late summer on the same day that he and defendant delivered a storm door to Marvin Hull for repair. Marvin Hull testified that he would have to look at his receipt to determine the date that the door was delivered to him, but that it was either September 23rd or 29th. However, Mr. Hull further testified that the receipt was made out the day that the door was returned to Mr. Talley.

There was testimony at trial concerning the defendant's relationship with Rosemary Hampton. An employee who had worked for Mrs. Hampton in an upholstery shop

testified that in June, 1979, the defendant brought his dune buggy in to be repaired. Although the repair work was completed in about two weeks, defendant stopped by the shop almost every day during the summer. His visits lasted up to one half hour in length and he chatted with anyone who was around including Mrs. Hampton on numerous occasions. At one point, Mrs. Hampton told the employee not to mention anything to her husband about the defendant's visits to the shop. Defendant was never at the shop when the victim was present.

There was testimony that the victim drove a dump truck before he died and that about two weeks after his death, defendant began to drive the vehicle on the victim's route. When there was no load to haul, the defendant was quite often at Mrs. Hampton's house, sometimes for hours.

The victim's sister testified that on September 6, 1979, Mrs. Hampton told her that she wanted to visit her sister in Wentzville, Missouri for the day. After Mrs. Hampton's return, she told the sister that her mother accompanied her on the trip, became sick on the way, and Mrs. Hampton had to spend the night. Mrs. Hampton told her sister that she had called her husband to tell him that she was going to spend the night. Further evidence was presented that defendant had checked into the Sheraton Airport Inn in Bridgeton, Missouri on September 5, 1979, and checked out on September 6. A phone call was made from defendant's room to the victim's home on September 6.

On a different date, defendant had registered at the Deslodge Inn, in Deslodge, Missouri, and two phone calls were made from Ronald Hampton's home phone to the Inn.

Defendant was arrested on January 29, 1980 in his home in Arnold, Missouri. The deputy sheriff who performed the arrest testified that at the time of arrest, defendant and Mrs. Hampton were living together and that he had received reports that they had been living together since a couple of weeks after the shooting.

There was testimony that prior to the victim's death, his relationship with his wife was at the breaking point. The victim's brother testified that on October 6, 1979, Mrs. Hampton told him that her husband was driving her crazy and that she did not know how much longer she could take it. The victim's sister-in-law testified that she and her husband had spent the evening of October 6, 1979 with the victim and his wife and that at one point, Mrs. Hampton told her that she found that she could live without her husband. There was testimony that in July or August, Mrs. Hampton had asked an employee of her store and her son how they felt about her obtaining a divorce.

Defendant testified denying any involvement in the shooting. He indicated that he spent the evening of October 6, 1979 at the Cowboy Club in St. Louis. He left the club at 11:45 p. m., drove to his parent's home in Florissant, parked in their driveway, and went to sleep in his vehicle.

Defendant admitted purchasing a .38 caliber revolver from Don Gaston, but testified that he had sold it in mid-to-late August, 1979, to a truckdriver, and that he regularly bought and sold guns.

As to his relationship with Mrs. Hampton, defendant testified that it started out as a business relationship. In September, they became more friendly and started talking about other things, including Mrs. Hampton's problems with her husband. Defendant claimed that they began going out together socially in mid-December and that he began living with her in mid-January.

Where, as here, there is no evidence to directly link defendant to the murder and the state must rely on circumstantial evidence, the circumstances and the facts must be consistent with each other and with the hypothesis of guilt, be inconsistent with the hypothesis of innocence, and point so clearly to guilt as to exclude every reasonable hypothesis of innocence. Circumstances need not be absolutely conclusive of guilt and need not demonstrate the impossibility of innocence. Furthermore, all evidence on the whole record tending to support the guilty verdict must be

taken as true, contrary evidence disregarded, and every reasonable inference tending to support the verdict indulged. *State v. Suschank*, 595 S.W.2d 295, 297 (Mo.App. 1979).

Applying the above principles, we conclude that the state made a submissible case against defendant. We reach this conclusion with defendant's claim of inference-stacking in mind.

"An inference may not properly arise which is 'dependent for establishment of one fact upon inference to be drawn from some other fact shown only by inference.'" *State v. Gonzales*, 533 S.W.2d 268, 272 (Mo. App.1976). "However, this prohibition does not apply to drawing several inferences from the same proven facts if each inference is supported thereby. Nor is an inference based in part upon another inference and in part upon proven facts prohibited, because it is a parallel inference provided it is a reasonable conclusion for the jury to deduce." *State v. Alexander*, 581 S.W.2d 389, 390–91 (Mo.App.1979) (citations omitted).

■■■ From separate facts, a jury could conclude that defendant was present at the scene of the crime; he was in possession of the murder weapon at the time of the crime; and he had a motive to commit the crime.[1]

We have examined defendant's other points of error and find that they are also without merit.

Judgment affirmed.

CRIST, P. J., and SNYDER, J., concur.

---

1. Motive is not an essential element of murder, *State v. Hodges*, 586 S.W.2d 420, 429 (Mo.App. 1979), but where, as here, a homicide case is based entirely on circumstantial evidence, and the defendant has denied the crime, proof of motive is of paramount importance. *State v. Kirksey*, 547 S.W.2d 149, 151 (Mo.App.1977). An alleged statement of defendant that he had been going with a woman other than his wife and the finding of a woman's photograph in his clothing was held by the Supreme Court to constitute sufficient evidence for the special prosecutor to argue to the jury that defendant was guilty of adultery as a motive for the murder of his wife. *State v. Henke*, 313 Mo. 615, 285 S.W. 392, 399 (1926).