**The Honorable William J. PETERS, Judge of Circuit Court of Jackson County, Missouri, Sixteenth Judicial Circuit, Division Sixteen, Respondent.**

**No. WD 35441.**

Missouri Court of Appeals,
Western District.

April 3, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 29, 1984.

Application to Transfer Denied July 17, 1984.

Joseph H. Locascio, Sp. Public Defender, Kansas City, John M. Torrence, Asst. Sp. Public Defender, for relator.

Albert A. Riederer, Pros. Atty., Robert Frager, Asst. Pros. Atty., Kansas City, for respondent.

**STATE of Missouri, Respondent,**

v.

**Omar Ray BURNS, Appellant.**

**No. WD 34595.**

Missouri Court of Appeals,
Western District.

April 10, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 29, 1984.

Application to Transfer Denied July 17, 1984.

Fred Duchardt, Public Defender, Liberty, for appellant.

John Ashcroft, Atty. Gen., Dan Crawford, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P.J., and NUGENT and LOWENSTEIN, JJ.

SOMERVILLE, Presiding Judge.

Defendant was charged as a "persistent offender" with kidnapping, § 565.110.1(5), RSMo 1978, a class B felony, § 565.110.2, RSMo 1978. He was also separately charged with rape, § 566.030.3, RSMo Supp.1983, a class A felony, § 566.030.4, RSMo Supp.1983. The victim of both offenses was a twelve-year-old female. By agreement of the parties, the kidnapping and rape charges were consolidated for trial.

A Clay County jury found defendant guilty of kidnapping and rape and assessed his punishment at fifteen years imprisonment for kidnapping and life imprisonment for rape. The trial court extended defendant's punishment on the kidnapping charge to thirty years imprisonment. Judgments were entered and sentences of thirty years imprisonment for kidnapping and life imprisonment for rape were pronounced accordingly, said sentences to run consecutively.

Three points of error are relied upon by defendant on appeal: (1) error in permitting the state to reopen its case to prove venue after it had rested; (2) error in overruling defendant's motion to suppress identification testimony and in permitting in-court identification testimony; and (3) error in denying defendant's motion for acquittal at the close of all the evidence as application of the doctrine of "destructive testimony" rendered the state's case fatally deficient regarding competent, substantial evidence to support the guilty verdicts.

The record reveals the following evidence, which, if believed by the jury, met the state's burden of proving defendant's guilt beyond a reasonable doubt. On December 11, 1981, at approximately 3:15 p.m., the victim, a twelve-year-old female, was walking home from school. When she reached the intersection of North Michigan and 67th Streets, Clay County, Missouri, she observed a light blue pickup truck stopped near the intersection with its hood up. A white male, identified by the victim both in a pre-trial lineup and during trial as the defendant, was standing alongside the truck and asked the victim if she would help him. The victim acquiesced and defendant asked her to get into the cab of the pickup and put her foot on the accelerator. While the victim sat in the truck, about ten minutes time elapsed while defendant appeared to be working on the motor. During the period of time just mentioned two of the victim's schoolmates walked by and later identified defendant as the man they saw working on the pickup truck in which the victim was sitting.

After defendant finished working on the pickup he returned to the cab, told the victim to "scoot" over, got in on the driver's side, and told the victim he would drive her home. The victim gave the defendant directions to her home but he took a different route. Realizing that defendant was not taking her home, the victim started

yelling and screaming. She then tried to open the door and get out of the truck. Defendant pulled out a knife and told her if she tried to get away he would "slash" her. He then fondled the victim's breasts, unzipped his pants, pulled out his penis, and asked the victim to "rub it". When the truck came to a stop sign the victim started kicking the windshield. At knifepoint, defendant again threatened the victim. Defendant then drove up a gravel road to an abandoned house in Clay County where he parked the pickup. After a struggle, he pinned the victim on the seat of the pickup and had intercourse with her. Throughout, the victim was yelling, screaming, and struggling to get free. Defendant then told the victim he would drive her home. The victim was afraid to give defendant her correct address. She gave him directions to the general area where she lived and he drove her there and let her out. As defendant drove off she observed the first letter and last three numbers of the license plate on the pickup. However, by the time she got home she had forgotten the last three numbers.

When the victim's mother arrived home she told her what had happened. Her mother called the police and a doctor. The victim went to the police station where she gave the police a description of defendant and described the pickup truck. She told the police the defendant had a red flower, outlined in light blue or green tattooed, on his right hand, a "little squiggly line or something" tattooed on his left hand, and a "big tattoo", light blue or "greenish" in color, tattooed on his right arm. She also told the police that defendant had "stubby" whiskers, "lightish" brown hair with a little bit of gray in it, that he was forty to forty-five years old, and was approximately five feet, eight inches tall.

Defendant became a prime suspect during the course of the investigation conducted by the police. Several days later the police contacted defendant and, with his approval, took pictures of tattoos on his hands and right arm. Defendant told the police at that time that his only means of getting to and from work was public trans-portation, thus implying that he didn't own a pickup truck. A few days later the victim, accompanied by a police officer, identified a pickup registered in defendant's name as the pickup driven by defendant on the day in question. The only difference between the two being that the pickup truck which the victim subsequently identified did not have a tailgate on it, although the pickup truck she was driven off in had a tailgate.

Twelve days after her unfortunate episode, the victim went to the police station where she viewed a lineup consisting of five male subjects, one of whom was the defendant. All five subjects had their hands and arms covered, thereby alleviating any taint of suggestiveness arising from defendant's tattoos. The victim picked defendant out of the lineup as the person who kidnapped and raped her. During trial, the victim, without hesitation or equivocation, made a positive in-court identification of defendant.

Defendant's first point, error in permitting the state to reopen its case to prove venue after denial of his motion for acquittal at the close of the state's case, is groundless. Although the intersection where the victim was picked up, as well as the location where the rape occurred, were both described by street locations, the evidence was silent as to either the town or county in which the streets were situate. After the state was permitted to reopen its case this evidentiary void was cured and venue was clearly fixed in Clay County regarding both offenses.

 As a general proposition, a trial court is vested with broad discretion in permitting the state to reopen its case. *State v. Haun*, 324 S.W.2d 679, 682 (Mo. 1959). A case more directly in point, *State v. Sykes*, 628 S.W.2d 653 (Mo.1982), holds that the trial court did not abuse its discretion in permitting the state to reopen its case to prove venue at the close of all the evidence and after a defense motion for acquittal had been overruled. Abuse of discretion vel non in permitting the state to

reopen its case is tested by the following criteria: "In exercising its discretion, the trial court will consider whether the newly admitted evidence will surprise the defendant, whether defendant has adequate opportunity to meet the proof and whether the order of proof will prejudice the defendant." *Id.* 657. In the instant case defendant has admitted with commendable candor in the argument portion of his brief that he "is at a loss to show the court that he was surprised by the proof of venue or that he was denied the opportunity to rebut the proof." No viable claim of prejudice can be attributed to the order of proof in the instant case as the state was permitted to reopen its case and prove up venue before defendant put on his case. Thus, an even stronger case than *Sykes* is presented for concluding that the trial court did not abuse its discretion in permitting the state to reopen its case for the limited purpose of proving venue. To hold otherwise would exalt form over substance at the expense of reality.

Defendant next claims that the pre-trial lineup viewed by the victim, and from which she picked out defendant, was so impermissibly suggestive that it tainted her in-court identification of defendant. His principal complaint of suggestiveness centers on the dissimilar physical appearance of the other four subjects who appeared in the lineup with defendant, coupled with the fact that defendant alone precisely fit the description which the victim previously gave the police. A police "show up report" revealed that the other four subjects ranged from thirty-one years of age to fifty-one years of age, from 5'6" in height to 6'3" in height, from 136 pounds in weight to 220 pounds in weight, and all had brown hair. Defendant attempts to further buttress his complaint of impermissible suggestiveness by singling out testimony of the victim at trial that none of the other four subjects in the lineup looked like her assailant, thereby irrevocably pointing the finger of suspicion at defendant. The basis for this latter contention is equally susceptible of being construed as indicative that defendant's appearance was so indelibly imprinted in the victim's mind that she entertained no doubts or qualms concerning the identity of her assailant.

■ Dissimilarity in physical appearance between individuals composing a lineup, standing alone, is insufficient to establish impermissible suggestiveness. *State v. Pennington,* 618 S.W.2d 614, 620 (Mo. 1981); *State v. Haymon,* 639 S.W.2d 843, 845 (Mo.App.1982); and *State v. Hayes,* 624 S.W.2d 488, 489 (Mo.App.1981). As pungently observed in *United States v. Lewis,* 547 F.2d 1030, 1035 (8th Cir.1976), cert. denied 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977), "[p]olice stations are not theatrical casting offices; a reasonable effort to harmonize the lineup is normally all that is required."

It is obvious that police went to some length to remove any suggestiveness from the lineup as witnessed by the fact that the arms and hands of all the individuals appearing therein were covered so as to conceal the presence or absence of any tattoos. After the victim identified defendant in the lineup as her assailant she was shown, for the first time, some photographs taken by the police of tattoos on defendant's hands and right arm which she recognized as those she observed on her assailant at the time in question. Defendant contends that the aforementioned constituted an added element of suggestiveness which tainted the victim's in-court identification of defendant.

■ A two-step analysis is relied on for determining whether pre-trial identification procedures are constitutionally blemished. "Were the investigative procedures employed by the police impermissibly suggestive? If so, were they so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial?" *State v. Higgins,* 592 S.W.2d 151, 159 (Mo. banc 1979). Both questions must be examined in light of the "totality of the circumstances". *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). This court is unconvinced that the composition of the

lineup and the victim's post-lineup view of pictures of defendant's tattoos, singularly or collectively, were "impermissibly suggestive" or, if so, that they were "so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial." Judicial inquiry into this crucial issue does not end, even if it be assumed, arguendo, that the pre-trial identification procedures were impermissibly suggestive.

"Reliability, not suggestiveness, 'is the linch-pin in determining the admissibility of identification testimony . . .', *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *State v. Carter,* 572 S.W.2d 430, 435 (Mo. banc 1978), and reliability of the in-court identification testimony is to be assessed under the 'totality of the circumstances.' [footnote omitted] *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, [382] 34 L.Ed.2d 401 (1972); *State v. Carter,* 572 S.W.2d 430, 435 (Mo. banc 1978); *State v. Charles,* 542 S.W.2d 606, 609 (Mo.App. 1976). Factors to be considered include: (1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, [382–383] 34 L.Ed.2d 401 (1972)."

*State v. Higgins, supra,* 592 S.W.2d at 160. The "totality of the circumstances" reveals that the victim's positive in-court identification of defendant was based on a definite image of defendant indelibly imprinted on her mind prior to the pre-trial identification procedures which defendant argues were maculated. Without being unduly repetitious, reliability of the victim's in-court identification of defendant is confirmed by even the most stringent application of the preceding factors vis-a-vis the record. She had an opportunity over an extended period of time to view defendant during daylight conditions, standing and sitting, both at close view and at a short distance; she displayed a keen degree of attentiveness as evidenced by her detailed description of defendant, both physically as well as the tattoos which adorned him; she gave a remarkably accurate description of defendant to the police shortly after her unfortunate experience; she identified the defendant in court during the trial without hesitation in a positive, straightforward manner; and she evinced the same degree of certainty when she encountered defendant in the lineup only twelve days after being victimized. The victim's in-court identification of defendant rested on a solid, independent basis giving it an impregnable status of reliability. Perforce, defendant's second point affords no basis for relief.

■■■ Defendant's third and final point questioning the sufficiency of the evidence to support the guilty verdicts must first be put in proper perspective. Defendant *does not* claim or contend that there was no evidence to support all requisite elements of both offenses. He limits his attack on the sufficiency of the evidence to the narrow basis that application of the rule of "destructive testimony" so thoroughly vitiated such evidence that it had no probative value. The infrequently encountered rule of "destructive testimony" or, as more aptly described, "destructive contradictions", is the progeny of rampant, inconsistencies and contradictions in the trial testimony of witnesses. As explicated in *Amish v. Walnut Creek Development, Inc.,* 631 S.W.2d 866, 870 (Mo.App.1982), citing *Atley v. Williams,* 472 S.W.2d 867, 870 (Mo.App.1971), "[t]he rule concerning destructive contradictions on which defendant relies *is applicable only to the respective elements of a witness's testimony at trial, not to contradictions between trial testimony and prior statements.*" (emphasis added) Moreover, the rule has been realistically tempered in that "the inconsistencies or contradictions must be so diametrically opposed to one another as to preclude reliance thereon and rob the testimony of *all* probative force." *City of Kansas City v. Scanland,* 506 S.W.2d 18, 20 (Mo.App.

1974). Thus, it is patently clear that the rule of "destructive testimony" or "destructive contradictions" rests solely on inconsistencies or contradictions in a witness' *own* testimony during trial. Inconsistencies or contradictions between a witness' trial testimony and statements made prior to trial, or where the testimony of a witness is inconsistent with or contradictory to the testimony of other witnesses, are not within the purview of the rule. Even when facially applicable, inconsistencies or contradictions in a witness' trial testimony must be so polarized as to "rob the testimony of *all* probative force." *City of Kansas City v. Scanland, supra.*

Defendant seeks to pulverize submissibility of the state's case under the rule of "destructive testimony" or "destructive contradictions" by applying it to certain testimony of the victim and that of her two schoolmates who made an in-court identification of defendant. The inconsistencies or contradictions relied on in each instance did not arise from the witnesses' trial testimony but from prior statements or the testimony of other witnesses. Consequently, no basis exists to invoke the rule of "destructive testimony" or "destructive contradictions". At best the contradictions or inconsistencies relied on by defendant merely went to the credibility of the various witnesses, not to the submissibility of the state's case. Extension of the rule of "destructive" testimony or contradictions as espoused by defendant, however laudable defense counsel's ingenuity may be said to be, would jeopardize the submissibility of every case whenever an opposing party offered contradictory testimony. The principal vice of defendant's theory is that it summarily assumes that all contradictory testimony offered by an opposing party is per se credible and ipso facto robs the testimony offered by the other party of all probative force. No surer way of usurping the sacred prerogative of juries can be imagined.

Testing the evidence in this case in the light most favorable to the state, and giving it the benefit of all reasonable inferences, this court holds that the verdicts returned by the jury finding defendant guilty of the nefarious crimes for which he stood trial were supported by competent, substantial evidence. Perforce, defendant's third and final point, from whatever angle approached, is untenable and wanting as a basis for relief.

Judgments affirmed.

All concur.