STATE of Missouri, Respondent,

v.

Robert E. BULLINGTON, Appellant.

No. WD 34893.

Missouri Court of Appeals,
Western District.

Dec. 11, 1984.

Richard H. Sindel, Clayton, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before LOWENSTEIN, P.J., and SOMERVILLE and NUGENT, JJ.

LOWENSTEIN, Presiding Judge.

This appeal arises from a burglary in St. Louis County on September 3, 1977 in which the defendant Bullington broke into a home with a shotgun, tied up and taped the eyes of two of the residents (mother and son of the victim) then took the victim, Pamela Sue Wright, age 18, with him as a hostage. Other facts will be recounted with the relevant point of error raised on appeal by Bullington. Suffice it to say at this juncture, Bullington, while brandishing the shotgun, told the mother and brother to be quiet or he'd blow their heads off. He told the brother, "Don't say a word or I'll split your head open like a watermelon." The victim's mother asked him to not take her daughter; his reply was, "Don't call the police or I'll kill her." He also said, "I'm alone and I don't want to be alone." The estimated time the two witnesses looked at Bullington was between 20 seconds and five minutes. Bullington was seen in the neighborhood prior to the break-in and kidnapping, leering at several young ladies who were washing cars. A white truck similar to Bullington's was seen parked in front of the victim's house on the evening in question. On September 7th he left his truck at work but he departed saying the police were after him. He never returned, but was next seen in Oklahoma on September 12th where he told of being wanted by the police at home, explaining, "I've done a terrible thing and I will have to pay with my life."

After being taken from the house Pamela was not seen alive again. On September 11, 1977 her badly decomposed body was found floating in a creek eight miles from her home. The cause of death was listed as drowning some three to seven days earlier. Crimes involved with the break-in were severed and tried on a change of venue in Jackson County. See 593 S.W.2d 224. This court affirmed those convictions, first degree burglary, flourishing a deadly weapon, and armed criminal action in *State v. Bullington*, 680 S.W.2d 238, handed down September 18, 1984. The motion for rehearing or transfer was denied October 25, 1984. Many of the facts and the long procedural history of this whole matter are contained in that opinion.

This appeal is from Bullington's trial in Boone County (on a change of venue) for the capital murder charge stemming from

the above facts. A jury found him guilty of murder in the first degree, § 565.003 RSMo 1978 as the killing was committed in the perpetration of kidnapping. On the basis of four prior felony convictions, the court also found Bullington to be a prior, persistent and dangerous offender. Sentence was set at life in prison. In a prior trial involving the homicide Bullington had been convicted and punishment set at life in prison without parole for 50 years. That conviction was overturned because of the application of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) which found infirm Jackson County's allowance of exemptions for jury duty for women. The United States Supreme Court in *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), said he could not upon retrial receive the death penalty.

Bullington here raises some seven points, all of which are denied.

## I.

■ Bullington's first point is that the identification testimony of the victim's mother and brother was improperly admitted into evidence because the testimony was the result of unnecessarily suggestive pretrial identification procedures. Assuming this question has been properly preserved, Missouri has adopted a two-step analysis for determining the constitutionality of these procedures: 1) Were the investigative procedures employed by the police impermissibly suggestive? 2) If so, were they so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial? *State v. Burns,* 671 S.W.2d 306, 310 (Mo.App.1984) quoting *State v. Higgins,* 592 S.W.2d 151, 159 (Mo. banc 1979).

In addressing the first prong of the analysis the defendant relies on Supreme Court cases that can be distinguished. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) held that an accused has a right to his attorney's presence during a post-indictment lineup. There is no complaint by this defendant on that aspect.

The court also gave examples of the potential for improper influence, such as a defendant being the only Oriental in a six-man line-up, or the only tall person, or young person. *Id.* at 232, 87 S.Ct. at 1934. The facts in *Wade* revealed the witnesses observed the defendant "within sight of an FBI agent" prior to the line-up. *Id.* at 234, 87 S.Ct. at 1936. While the court did not assume this was *intentionally* designed, the prejudicial effect was a result of police procedures. However, in the present case, Bullington points to the mother and brother's exposure to his picture on television and in the newspaper. In no way can the police be held accountable for media coverage. In fact the mother admitted the police tried to keep the newspaper articles away from her.

The defendant also cites *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The court considered whether the procedure was so "unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Id.* at 302, 87 S.Ct. at 1972. Stoval was taken to a hospital to be shown to the victim. He was handcuffed to one of five police officers, and was the only negro in the room, yet this procedure was affirmed when viewed in light of the "totality of the circumstances." The procedures in this case had far less potential for mistaken identification.

A third case relied on by the defendant is *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). There, besides two line-ups, the only eye-witness was given a one-on-one confrontation with Foster. The witness made no positive identification until the third viewing. This is far different from the present case where the victim's brother identified the defendant from a photograph the first time it was shown to him. While it is true the mother could not identify the defendant by a photograph, she said from the very start she would need to hear his voice. And in fact when a line-up was finally arranged, the mother made positive voice identification.

Bullington next attacks the dissimilarities among the men in the line-up. This fact alone is insufficient to establish impermissible suggestiveness, for a line-up does not require exact conformity. *State v. Taylor,* 661 S.W.2d 794, 798 (Mo.App.1983); As stated in *State v. Burns,* 671 S.W.2d 306, 310 (Mo.App.1984); "[p]olice stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required." The record is bare as to any error in the line-up to cause it to have been tainted.

Since the investigative procedures employed by the police were *not* impermissibly suggestive, this court need not address the second prong of the analysis, and the cases cited by the parties for that proposition.

## II

■ Bullington's second point concerns the exclusion of testimony from Dr. Buckhout, a psychologist and expert in the field of perception. In an offer of proof he indicated Dr. Buckhout would have testified without any reference to specific witnesses as to the results of scientific research regarding (1) the effects of stress on perception; (2) the effects of limited opportunities to observe on the ability to remember and recall accurately what has been observed; (3) the effect of the length of time between the observation and a recall test on the ability to remember and recall accurately what was observed; (4) the effects of group discussion among observers on the ability to remember and recall accurately what has been observed; and, (5) the deficiencies in reliability between various kinds of recall tests.

This very doctor's testimony has been excluded in the following jurisdictions. *See United States v. Thevis,* 665 F.2d 616, 641–642 (5th Cir.1982); *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Fosher,* 590 F.2d 381, 383–384 (1st Cir.1979); *United States v. Brown,* 501 F.2d 146, 150–151 (9th Cir. 1974); *United States v. Collins,* 395 F.Supp. 629, 635–637 (M.D.Pa.1975); *State*

*v. Wooden,* 658 S.W.2d 553, 556–557 (Tenn. Crim.App.1983); *State v. Stucke,* 419 So.2d 939, 944–945 (La.1982); *People v. Valentine,* 53 A.D.2d 832, 385 N.Y.S.2d 545, 546 (1976).

For the reasons stated in *State v. Bullington, supra,* at pages 11 through 13 of the slip opinion, the court on the basis of the nebulous character of the proposed general testimony of an expert on witness perception, as presented here, make the trial judge's hesitancy to allow this testimony entirely justified. On this record, the court did not abuse its discretion in rejecting the testimony. The point is denied.

## III.

■ The third point on appeal contends the court improperly excluded testimony by defendant's witness concerning voice comparison. The witness was an assistant public defender who had represented Bullington. The defense sought to rebutt the mother's statement of the perpetrator's voice being as deep as one of the investigating officers. The point also generally attacks the mother's in-court voice identification. Bullington relies on *Eichelberger v. State,* 524 S.W.2d 890, 894 (Mo.1975), where the court held a witness need not be qualified as an expert for an in-court voice identification, and that the lack of training merely goes to the weight of the evidence. *Eichelburger* supports the admission of the mother's testimony *identifying* the defendant's voice but it does not support a witness *comparing* the defendant's voice to another man's.

Bullington is mixing apples and oranges when he says the mother was permitted to make a "comparison" between the voice she heard at the line-up and the voice of the man who broke into her house. The mother was simply testifying that the voice she heard on those two occasions came from one and the same man. This is distinguished from analyzing the similarities and differences between two separate people's voices.

The facet of the point that the mother testified on cross-examination about a com-

parison she made between the defendant's voice and that of Detective Chasteen's, is without merit. However, the mother never testified that the two voices were definitely the same; she only admitted making an out-of-court statement that "maybe" the defendant's voice, "was as deep as," Chasteen's. Therefore, the trial court did not abuse its discretion in excluding the proffered rebuttal testimony.

## IV

■ In Bullington's next point he contends the trial judge erred in admitting in evidence a shotgun that was unconnected to him or the crime, and the jury might have been misled into believing the gun was the one used in the commission of the kidnapping. The shotgun used by Bullington when he entered the Wright's home and to effectuate the kidnapping of the victim was never recovered. The prosecutor was allowed to introduce a Model 1200 Winchester shotgun. The victim's mother and brother were shown the weapon as well as Gronek who had sold to a man named "Bullington" a similar weapon. The questions to these witnesses clearly showed the exhibit was not the weapon used in the crime. There could have been no misunderstanding on this matter by the jury.

However, the argument of Bullington that the demonstrative value of the shotgun outweighed by the prejudicial effect of introducing a lethal weapon unconnected with the crime presents a closer issue.

Even excluding the matter of the sale of a similar model by Gronek the victim's mother and brother had testified to and described a weapon used by Bullington in their home. The mother said the exhibit was "similar" to the one she saw—it had a long shiny barrel and had engraving on the wood. The son said the exhibit was generally the same except for length of the barrel.

"As a general rule weapons and objects not connected with the defendant on the crime are not admissible unless they have some probative value." *State v. Wynne,*

353 Mo. 276, 182 S.W.2d 294, 299 (1944). This rule was refined in *State v. Charles,* 572 S.W.2d 193, 198 (Mo.App.1978), by saying lethal weapons, "completely unrelated to and unconnected" with the crime for which the accused is on trial have a "ring of prejudice," which when used or displayed in evidence result in prejudicial error. The conviction in *Charles* was reversed when a gun totally foreign to the offense for which the accused was charged was introduced. In *State v. Moore,* 645 S.W.2d 109 (Mo.App.1982), relied upon by Bullington, a weapon found in the defendant's path of flight but not identified by the victim as the robbery weapon, injected prejudicial error by its admission. It would seem the state could have made its case as to the use of a weapon by Bullington on the testimony of the mother and son, without producing a replica, or entering into the thicket of tracing, through the cancelled check, the sale of a similar model gun from Gronek to Bullington (whom Gronek could not identify at trial).

The state offers *State v. Woods,* 637 S.W.2d 113, (Mo.App.1982), as an antidote for *Wynne, Charles,* and *Moore.* The defendant in *Woods* was charged with introducing a weapon into a place of confinement to aid an escape. A model, but not the pistol purchased by the defendant was introduced. The court said a model or replica of an unavailable object is admissible so long as relevant to a material issue. *Id.* at 117. The *Woods* court held the replica of the weapon relevant. Here, too, the shotgun was relevant in that Bullington was seen using such a weapon to effectuate the kidnapping, an element of the first degree murder charge under § 565.003. The eye witnesses here had described to police a weapon that was connected to the defendant and the crime. The model introduced in evidence was recognized as being similar to the one Bullington used. The weapon here, though not the one used, was connected to the crime as charged. *Cf. State v. Fristoe,* 620 S.W.2d 421, 426 (Mo. App.1981).

The admission of the demonstrative evidence was not prejudicial. The weight of its presentation was for the jury. *State v. Lawson,* 585 S.W.2d 247, 250 (Mo.App. 1979). Identification was not insufficient merely because it was described as "similar to or, or looks like". *Id.* at 250. *State v. Hubbard,* 659 S.W.2d 551, 557 (Mo.App. 1983).

### IV.

 The fifth point is whether the state adequately proved the corpus delicti, *i.e.* the death of a human being, and the criminal agency of another. *State v. Priest,* 660 S.W.2d 300, 304 (Mo.App.1983). While it is true the defendant's guilt was established entirely by circumstantial evidence, this is no bar to sustaining the conviction. *State v. Tatum,* 656 S.W.2d 305, 309 (Mo.App.1983). This court must view the evidence and all of its reasonable inferences in the light most favorable to the state, disregarding any evidence or inferences to the contrary. *Id.*

Bullington, within this point, argues he was not the criminal agent and the state didn't make a case. This boils down to whether the jury's verdict can be justified by utilizing the inference that the defendant was a criminal agent responsible for the victim's death because he was found to have kidnapped her. The cases cited by Bullington on this point, *State v. Lane,* 497 S.W.2d 207 (Mo.App.1973) and *State v. Morse,* 515 S.W.2d 608 (Mo.App.1974), are both burglary cases and do not shed light on the question of murder. They merely state the general proposition that when evidence is entirely circumstantial, the facts relied on by the state must be consistent with each other and the hypothesis of guilt, and be inconsistent with, and exclude every *reasonable* hypothesis of innocence.

Bullington poses the hypotheses that the victim could have drowned by accident or at the hands of another. However, as this court said in *State v. Priest, supra,* at 305, the state need not "rule out *all possible* hypotheses." The facts in *Priest* are parallel to the present case. A young girl was last seen in the company of the defendant. Two days later her body was found floating in a pond. Cause of death was drowning, and as with Pamela Wright, the body was too decomposed to determine signs of struggle or molestation. The court admitted the establishment of corpus delicti was marginal, yet held that reasonable minds could exclude the possibility of accident. In the present case the facts are even stronger. Bullington forcibly entered the victim's house and abducted her at gunpoint. He told the mother if she called the police he would kill the daughter. This plus Bullington's incriminating statement made some two weeks after the murder that "I've done a terrible thing and I will have to pay with my life," make it abundantly clear that Bullington's hypotheses do not rise above the level of possibility.

The corpus delicti was established in this case. Bullington's suggestion of accident, that the victim may have fallen into the creek while walking in the woods topless, is rejected. As to whether the state made a case as to *his* causing the death, though based on circumstantial evidence, the answer is in the affirmative. The circumstances and facts here were consistent with each other and with guilt, but the burden was not on the state for them to demonstrate the impossibility of innocence. *State v. Abbott,* 654 S.W.2d 260, 268 (Mo.App. 1983). The state made a case, and the facts and circumstances read in a light supporting the verdict. *State v. Moss,* 622 S.W.2d 292, 296 (Mo.App.1981).

### VI

 Bullington contends that the trial court abused its discretion in denying his request to individually question the jury panelists or in denying his alternative request of the challenge for cause of all panelists who had heard or seen newscasts concerning his previous trial. A trial court has broad discretion in the conduct of *voir dire,* and this court will not interfere absent an abuse of discretion. *State v. Williams,* 659 S.W.2d 298, 300 (Mo.App.1983). Furthermore, individual questioning of po-

tential jurors is not required even in capital murder cases. *State v. Jimmerson*, 660 S.W.2d 475, 477 (Mo.App.1983). The facts here do not warrant an exception to this rule absent an indication that prejudice likely occurred, the trial court cannot be said to have abused its discretion in this denial. *Jimmerson, supra*, at 477. There was no evidence that the jurors had heard any more than the fact the case was in Boone County on a change of venue. There was no response to defense counsel's question whether anyone had heard something about this particular case other than what they'd already told the court.

■■■ As to defendant's blanket challenge for cause, exposure to publicity is not deemed inherently prejudicial. *State v. Molasky*, 655 S.W.2d 663, 667 (Mo.App. 1983). Even if one of the eleven potential jurors had said they had formed an opinion from what they had heard, that juror may be sworn if he is able to set aside any opinion formed from the publicity. *Id.* Here all the jurors indicated to the court they had heard nothing that would even cause them to *form* an opinion. The news reports, according to the record, did not go into the details of the case, but that it was being tried in Boone County on a change of venue from St. Louis. The defendant's sixth point is denied.

■■■ The last point on appeal concerns the admissibility of evidence seized from the defendant's home and truck during a warrantless search. This issue was also addressed in *State v. Bullington, supra*, at 242, where it was denied. This court reaches the same result.

Of the items seized only three were introduced into evidence: a rug shampoo box, a cancelled check (from Bullington to Gronek), and a strand of hair. The defendant did not object to the box being offered, nor did he demonstrate in his appeal any prejudice suffered. As far as the court can determine from the record, this box had no bearing on the case whatsoever. The defendant here has the burden of both error and prejudice. *State v. Lantigua*, 652 S.W.2d 177 (Mo.App.1983).

When the check was offered into evidence, the defendant's objection was there was no evidence that the check had been drawn or signed by him; there was no objection to the check being the result of an illegal search. This check was introduced into evidence in connection with state's witness, Gronek, who testified he had sold a gun to a man whose credentials identified him to be Robert E. Bullington. The weapon itself was not produced (but see point four above concerning the replica of the gun being introduced). Even though Gronek's testimony and the cancelled check have more bearing on the case than the rug shampoo box, the possible prejudice is *de minimus* when viewed with the other evidence in the case, including the mother and brother's identification of the defendant, and their testimony as to his flourishing a shotgun. The attempt to trace the possible sale of such a weapon from Gronek to Bullington was cumulative and any error in its introduction was harmless. *U.S. v. Leichtling*, 684 F.2d 553, 557 (8th Cir.1983). *Cf. State v. Maddox*, 657 S.W.2d 719 (Mo. App.1983) (where the other evidence supporting the conviction was hazy).

Finally, while the introduction of the strand of hair was rather ineptly objected to, the defendant did not demonstrate how this hair could prejudice him. Even if the jury believed the hair belonged to the victim, at most it indicated she had been in the defendant's truck. The record has far more inculpatory evidence than this to link defendant to Pamela Wright's death. Consequently, the validity of the search and seizure of the defendant's house and truck are irrelevant.

The judgment is affirmed.

All concur.